[No. C000584. Third Dist. Feb. 28, 1989.]

CHICO FEMINIST WOMEN'S HEALTH CENTER, Plaintiff and Appellant, v.
FRANCES SCULLY et al., Defendants and Appellants.

**COUNSEL**

Paul T. Persons, Cathleen A. Williams and Kanter, Merin, Dickstein & Kirk for Plaintiff and Appellant.

Paul J. Henry, Lawrence A. Fuqua, Lawrence A. Puritz, Matthews, Fuqua & Puritz, Larry L. Crain and John W. Whitehead for Defendants and Appellants.

**OPINION**

**SIMS, J.**—The Chico Feminist Women's Health Center (Center) operates a clinic in the City of Chico where abortions are performed. The Center moved to amend a preliminary injunction by obtaining an additional injunctive order excluding defendants, citizens of Chico who have picketed the Center, from "any vantage point from which clients entering the [clinic] can be identified" on Saturdays when abortions are performed. The prohibited vantage points would include the public streets and sidewalks immediately in front of the Center. The Center argued that by being present in the vicinity of the Center, defendants could learn the identity of those obtaining abortions, thereby violating the rights of privacy of clients who obtained

abortions and "chilling" the rights of others who would obtain abortions but for the disclosure of their identities.

The trial court refused the requested order but amended the preliminary injunction by adding several orders, one of which provided, "No picketer shall identify or disclose the identity of any person approaching, entering, or leaving the . . . Center . . . or harass any person in this fashion." Both the Center and defendants have appealed from the order modifying the preliminary injunction.

We hold that the trial court did not abuse its discretion in refusing to enter the injunctive order sought by the Center. We also modify the amended orders to eliminate defendants' complaint of uncertainty. However, we hold that defendants' attempt to challenge orders in the original preliminary injunction is an untimely appeal which must be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 1985 antiabortion picketing began on the sidewalk outside the Center on Saturdays when abortions were performed. This picketing generated approximately 40 written complaints from Center clients regarding harassment by picketers.

This harassment typically consisted of the following: As clients arrived at the Center picketers would rush up to their cars. Picketers would shout at clients, attempt to stop them on the sidewalk, thrust pamphlets at them, photograph them, and record their vehicle license plate numbers. Clients would be forced to pass through or around the picketers in order to enter the Center.

One result of this activity, according to the Center's medical director, was that clients were delaying their abortions until later in the term when the operation is riskier. A second result was that clients would arrive for their operations in a heightened emotional state and would have a difficult time relaxing. To help clients relax, the medical director would have to administer increased medications compounding the health risk to the clients.

The Center responded to the picketing by assembling a team of volunteer escorts to accompany clients from their cars to the Center and back again. The escorts would use umbrellas to attempt to shield clients' faces from the picketers' cameras.

In December 1985, the Center petitioned for a temporary restraining order and preliminary and permanent injunctions; the trial court refused to

enter a temporary restraining order but issued an order to show cause. ■ ■ ■ ■ Following a hearing, the trial court on February 27, 1986, issued an order granting a preliminary injunction providing in pertinent part as follows:[1]

"[D]efendants . . . and their officers, agents, representatives, employees and members, and each of them, and each and every person acting at the direction of, or in combination or in concert with said defendants be, and hereby are, restrained and enjoined from doing any of the acts or things herein set forth below:

"(1) Either the defendants or plaintiff photographing any person at or coming to or going from [the Center];

"(2) Blocking any entrance and exit into the . . . Center . . . ;

"(3) Plaintiff and defendants from shouting and/or using any voice amplification devices for the purpose of harassment, and/or demonstrating at the [Center];

"(4) Using any tape recording device or recording device in front of the . . . Center . . . ;

"(5) Following clients and/or from being within 15 feet of clients in their cars without having been invited;

"(6) Picketing, parading, marching, standing, occupying, assembling, grouping or gathering, or inducing, encouraging, or causing such conduct in the following area:

"A zone 10 feet wide from the doorway of plaintiff's premises to Flume Street. Provided however, that, defendants may cross said zone one at a time nine feet or more from the wall of the building in order to pass from one side of the sidewalk to the other; and provided, however, that defendants may maintain, under conditions herein specified, one (1) picket or other person at either side of such 10 foot zone;

"(7) Picketing, parading, marching, standing, walking, assembling, grouping, or gathering or stationing, placing or maintaining pickets within

---

[1] Although styled a temporary restraining order, the order is a preliminary injunction. As explained by Witkin, "A temporary restraining order is issued to prohibit the acts complained of, pending a hearing on whether the plaintiff is entitled to a preliminary injunction." (6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 247, p. 214.) A temporary restraining order "is distinguishable in the following respects: It may be issued ex parte; a bond, though commonly required, is not essential; and it is of short duration, normally expiring at the time of the hearing on the preliminary injunction." (*Ibid.*) The present order, issued after a hearing, is a preliminary injunction. (*Ibid.*; see Code Civ. Proc., § 527, subd. (a).)

10 feet from any other picketer. Such 10 foot distance is to be maintained by all picketers within the zone which extends 25 feet from the most northernly and most southernly point of the building . . . ;"

"(8) Accosting, addressing, or offering literature to, any employee, agent, client, visitor, business invitee of plaintiff who has already refused such offer or address;

"(9) Standing in or stepping in the path or right of way of plaintiff's employees, agents, clients, visitors, business invitees, on the west sidewalk of Flume Street between Third and Fourth Streets, Chico, California;

"(10) Recording license plates of plaintiff's employees, agents, clients, visitors, and business invitees;

"(11) Clinic may escort clients, using two escorts to the Clinic and two escorts from the Clinic. Clients may not be shielded from pickets by means of umbrellas of [sic] otherwise unless client chooses to be shielded."

The Center served defendants notice of entry of this preliminary injunction.

Approximately one week after the injunction issued, on Saturday, March 8, 1986, picketer George W. observed client Barbara Doe enter the Center. George W., who was acquainted with Barbara Doe and her sister Kimberly Doe, apparently informed Kimberly that Barbara was present at the Center. Soon after Barbara's arrival, the Center staff informed her that a man had telephoned asking if Barbara was there. After that call, Kimberly telephoned the Center and spoke to Barbara urging her not to have an abortion. Shortly thereafter the Center staff informed Barbara that Kimberly had arrived at the Center. Barbara asked that her abortion be performed immediately. Afterward Barbara left the Center down a fire escape at the rear of the building in order to avoid a confrontation with picketers. In a declaration, Barbara stated she knew of no way Kimberly could have learned from or through her that she would be at the Center that day.

As a result of this breach of client confidentiality and other alleged incidents, the Center on April 10, 1986, noticed a motion to amend the preliminary injunction to prohibit picketing at the Center from 8 a.m. until 5 p.m. on Saturdays.

Following a hearing the trial court on April 25, 1986, issued an order providing: "1. No picketer shall identify or disclose the identity of any

person approaching, entering, or leaving the Health Center at 330 Flume Street, or harass any person in this fashion.

"2. Picketers must maintain a 10 foot distance from any other picketer at all times on Flume Street between 3rd and 4th Streets. This includes coming to or leaving the area.

"3. At no time shall there be more than 7 picketers on Flume Street between 3rd and 4th Streets in Chico, California.

"Except as amended herein, said Temporary [*sic*] Injunction of February 27, 1986 and all the provisions thereof shall remain in full force and effect."

On June 4, 1986, plaintiff served a copy of this order on defendants and their counsel. On June 20, 1986, the Center filed notice of appeal from this order and on July 9, 1986, defendants also noticed an appeal from the order.[2]

DISCUSSION

I

*The Center's Appeal*

■ We first consider the Center's contention that the trial court should have enjoined all picketing activity on Saturdays when abortions are performed. As noted, the trial court enjoined picketers from identifying or disclosing the identity of anyone entering or leaving the Center. The Center contends, however, that its clients have a right to obtain an abortion in complete privacy and the right is destroyed whenever anyone who knows them sees them entering or leaving the Center on a Saturday. Thus, the Center claims it is entitled to an order excluding defendants from any vantage point from which they may observe clients entering or leaving the Center. For reasons that follow, we cannot agree.

A. *Standard of Review*

■ In *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63 [196 Cal.Rptr. 715, 672 P.2d 121], our Supreme Court summarized rules for

---

[2] Subdivision (f) of Code of Civil Procedure section 904.1 provides that an appeal may be taken, "From an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction." The Center's appeal is properly from the trial court's order refusing to enter the requested preliminary injunction. (See *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 507 [217 Cal.Rptr. 225, 703 P.2d 1119]; *Abar* v. *Rogers* (1981) 124 Cal.App.3d 862, 864 [177 Cal.Rptr. 655].)

review of a trial court's ruling on a request for a preliminary injunction: "The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court. [Citations.] As this court explained in *People* v. *Black's Food Store, supra,* 16 Cal.2d at page 61, 'The authorities are numerous and uniform to the effect that the granting or denial of a preliminary injunction on a verified complaint, together with oral testimony or affidavits, even though the evidence with respect to the absolute right therefor may be conflicting rests in the sound discretion of the trial court, and that the order may not be interfered with on appeal, except for an abuse of discretion. [Citations.]' [¶] A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence.' " [Citations.] Further, the burden rests with the party challenging the injunction to make a clear showing of an abuse of discretion. [Citations.] [¶] ■ This court has traditionally held that trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]" (*Id.,* at pp. 69-70; see *King* v. *Meese* (1987) 43 Cal.3d 1217, 1226 [240 Cal.Rptr. 829, 743 P.2d 889]; *Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].)

B. *The Center Was Not Entitled to an Injunction Excluding Defendants From Public Streets and Sidewalks Merely Because Defendants Might Recognize Clients.*

■ The Center argues defendants should have been enjoined from being present at the Center when abortions are performed because by learning which clients are having abortions, defendants violate the clients' federal constitutional right to privacy.[3] (See *Roe* v. *Wade* (1973) 410 U.S. 113, 152-155 [35 L.Ed.2d 147, 176-178, 93 S.Ct. 705].) Before analyzing this contention, however, we think it important to focus clearly upon the nature of the Center's privacy claim, which was asserted below in a declaration under penalty of perjury executed by the administrator of the Center and reiterated in the Center's brief on appeal as follows: "Because Chico is a small community, it is more difficult for the Feminist Women's Health Center to insure the anonymity of its clients, than in a large metropolitan community. For all of our clients in the abortion clinic, this is an utmost concern [for] the picketer. The picketers present in front of our client may indeed

---

[3] Defendants have made no objection to the standing of the Center to assert the privacy rights of its clients.

recognize our clients. They may indeed be members of their own family, church or school. As long as the picketers are in front of the clinic we cannot guarantee to our clients that they will not be recognized. I have spoken to at least two clients who have not come to the Feminist Women's Health Center because they fear being recognized by the picketers."

The Center's primary request for injunctive relief is therefore not premised on acts of harassment, nor upon the number of defendants present at the Center, nor upon any communication of the clients' identities by defendants to others. The claimed invasion of privacy is mere recognition. The invasion is occasioned simply by defendants' being present on public ways outside the Center. The Center admits its request for relief is unprecedented. We shall conclude the Center is not entitled to the requested relief.

■ The first question is whether the clients have a right of privacy that may protect them from intrusions by defendants. The federal constitutional right of privacy has been construed as implicating "at least two different kinds of interests. One is *the individual interest in avoiding disclosure of personal matters,* and another is the interest in independence in making certain kinds of important decisions." (*Whalen* v. *Roe* (1977) 429 U.S. 589, 599-600 [51 L.Ed.2d 64, 72-73, 97 S.Ct. 869], fns. omitted, italics added.) Thus, the United States Supreme Court has remarked that " 'It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny . . . .' " (*Thornburgh* v. *American Coll. of Obst. & Gyn.* (1986) 476 U.S. 747, 766 [90 L.Ed.2d 779, 797, 106 S.Ct. 2169.].)

■ It is unclear whether the federal right protects citizens from invasions of their privacy by private citizens or whether the federal right guards only against state action. (See *Roe* v. *Wade, supra,* 410 U.S. at p. 153 [35 L.Ed.2d at p. 177]; compare *Bering* v. *Share* (Wash. 1986) 721 P.2d 918, 928-929, cert. dism. *sub nom. Share* v. *Bering* (1987) 479 U.S. 1050 [93 L.Ed.2d 990, 107 S.Ct. 940].) However, our state privacy guaranty is broader than the federal privacy right. (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 263 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118].) Article I, section 1 of the California Constitution expressly makes the pursuit and obtaining of privacy an "inalienable right." The state right of privacy protects information about a citizen's participation in a medical procedure, including abortion. (See *People* v. *Stockton Pregnancy Control Medical Clinic, Inc.* (1988) 203 Cal.App.3d 225, 241 [249 Cal.Rptr. 762]; *Planned Parenthood Affiliates* v. *Van de Kamp* (1986) 181 Cal.App.3d 245, 276-278 [226 Cal.Rptr. 361]; see also *Binder* v. *Superior Court* (1987) 196 Cal.App.3d 893, 901 [242 Cal.Rptr. 231]; *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138, 1147 [212 Cal.Rptr. 811]; *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d

669, 679 [156 Cal.Rptr. 55].) And it has been held the state privacy right protects against invasions of privacy by private citizens as well as the state. (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 829 [134 Cal.Rptr. 839], followed in *Park Redlands Covenant Control Committee* v. *Simon* (1986) 181 Cal.App.3d 87, 98 [226 Cal.Rptr. 199] [citing other authorities following *Porten*].)

Even though the clients have a privacy interest in their medical procedure, it is altogether a different question whether that interest extends to protect their identities on public streets which "have immemorially been held in trust for the use of the public . . . ." (*Hague* v. *C.I.O.* (1938) 307 U.S. 496, 515 [83 L.Ed. 1423, 1436, 59 S.Ct. 954.) One answer to that question is found in the rule that "What constitutes a 'reasonable' expectation of privacy depends on the circumstances and is measured by common habits in the use of domestic and business properties. [Citations.]" (*In re Deborah C.* (1981) 30 Cal.3d 125, 137 [177 Cal.Rptr. 852, 635 P.2d 446].)

The rule of *Deborah C.* recognizes that a citizen's reasonable expectations of privacy are conditioned by the world in which the citizen lives, i.e., by "common habits" found there. It is this crucial point that the Center misunderstands. The very "small-town" characteristics that prompted the Center to request its injunctive relief are the very characteristics that make the relief inappropriate. Because Chico is a small city, the clients are more likely to be recognized. But that increased chance of recognition on a public street is a "common habit" of Chico. We have no doubt that Chico's smaller size makes it a most attractive place to live in many respects. But the clients who are residents of Chico must accept the limitations of small-city life along with its amenities. One of those limitations is a greater chance of recognition in public places by other citizens. Having chosen to live in the environment of a small city, the residents of Chico cannot expect the courts, by way of injunctive relief, to guarantee them the kind of anonymity they might find in a "large metropolitan community" such as New York City. We are confident that, judged by the "common habits" of Chico as described by the Center's own administrator, the clients had no reasonable expectation of anonymity on Chico's public sidewalks and streets between 8 a.m. and 5 p.m. on Saturdays.

C. *The Center's Proposed Rule Would Be Incapable of Fair and Equal Application by the Courts.*

Even assuming the clients had some "limited privacy interest . . . on the public streets" (*Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 212 [45 L.Ed.2d 125, 132, 95 S.Ct. 2268]), we would still affirm the trial court's order for other reasons.

■ The first is that we think the courts could not apply the rule proposed by the Center fairly and equally. While the Center's clients doubtless have an important interest in protecting the privacy of their medical procedure, that privacy interest is not unique. It is shared by other citizens who participate in a myriad of other medical procedures ranging from oncology to plastic surgery to psychiatry. It is also shared, to differing degrees, by those who visit attorneys and pharmacies and adult book stores. Indeed, the list of providers of goods or services that, by their nature, disclose private aspects of the life of the consumer is long. Were we to adopt the rule sought by the Center, we think the courts would soon be deluged with requests from these providers for privacy protection for clients on the public streets during ordinary business hours. We see no convenient way to "rank" these privacy interests so as to grant relief to some and not to others. Thus, we think the courts would face the prospect of carving out countless private easements over public streets and highways to allow the clients of certain services to maintain their privacy during ordinary business hours. This is not a job the courts could do well, even assuming they could do it at all.

D. *The Trial Court Did Not Abuse Its Discretion in Refusing to Bar Defendants From the Vicinity of the Center on Saturdays Because the Center Failed to Show That Defendants Had Ample Alternatives For Communicating to Their Target Audience.*

■ There is a final reason why the trial court properly rejected the Center's requested relief: the Center failed to show defendants had ample means of communicating with those obtaining abortions if defendants were excluded from the vicinity of the clinic on Saturdays. This reason goes not only to the Center's claim that the clients were entitled to be protected from recognition but also to an apparent additional argument that defendants' concentrated surveillance outside the Center constituted a form of harassment that required defendants' exclusion from the vicinity of the Center on Saturdays.

As is obvious, and as the Center acknowledges, defendants were not simply conducting surveillance; they were also engaged in picketing—an activity implicating the free speech rights of defendants under the First Amendment to the federal Constitution (*Organization For a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 5, 91 S.Ct. 1575]) and under article I, sections 2 and 3 of the California Constitution. (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], affd. *sub nom. Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035].)

■ Under current First Amendment analysis, the extent to which defendants' rights of speech may be curtailed begins with identifying the

forum used by defendants to communicate their message. "The 'public forum' doctrine holds that restrictions on speech should be subject to higher scrutiny when, all other things being equal, that speech occurs in areas playing a vital role in communication—such as in those places historically associated with first amendment activities, such as streets, sidewalks, and parks—especially because of how indispensable communication in these places is to people who lack access to more elaborate (and more costly) channels." (Tribe, American Constitutional Law (2d ed. 1988) §§ 12-24, p. 987, fns. omitted.)

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' [Citation.] In these quintessential public forums, *the government may not prohibit all communicative activity.* . . . The State may . . . enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, *and leave open ample alternative channels of communication.* [Citations.]" (*Perry Ed. Assn.* v. *Perry Local Educator's Assn.* (1983) 460 U.S. 37, 45 [74 L.Ed.2d 794, 804-805, 103 S.Ct. 948], italics added; see also *Heffron* v. *Int'l Soc. For Krishna Consc.* (1981) 452 U.S. 640, 654 [69 L.Ed.2d 298, 310, 101 S.Ct. 2559].)

These principles were applied last term by the high court in *Frisby* v. *Schultz* (1988) 487 U.S. 474 [101 L.Ed.2d 420, 108 S.Ct. 2495], a case which controls here. In *Frisby,* antiabortion picketers sought to picket on the public sidewalk outside the residence of a doctor who evidently performed abortions. (*Id.,* at p. 476 [101 L.Ed.2d at p. 426].) After picketing had occurred on six occasions the town board passed and amended an ordinance which in its amended form provided, " 'It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield.' " (487 U.S. at p. 477 [101 L.Ed.2d at pp. 426-427].)

In rejecting a facial attack on this ordinance, the court began by explaining: "The antipicketing ordinance operates at the core of the First Amendment by prohibiting appellees from engaging in picketing on an issue of public concern. Because of the importance of 'uninhibited, robust and wide-open' debate on public issues [citation], we have traditionally subjected restrictions on public issue picketing to careful scrutiny. [Citations.] Of

course, '[e]ven protected speech is not equally permissible in all places and at all times.' [Citations.]" (487 U.S. at p. 479 [101 L.Ed.2d at p. 428].)

The court rejected the doctor's contention the residential streets were not traditional public fora, concluding "No particularized inquiry into the precise nature of a specific street is necessary; *all public streets are held in the public trust and are properly considered traditional public fora*." (487 U.S. at p. 481 [101 L.Ed.2d at p. 429], italics added.)

The court next construed the ordinance as banning only focused picketing taking place solely in front of a particular residence. (487 U.S. at p. 483 [101 L.Ed.2d at pp. 430-431].) It then considered whether the ordinance left open ample alternative channels of communication as required by the test of *Perry Ed. Assn.* v. *Perry Local Educator's Assn., supra,* 460 U.S. at p. 45 [74 L.Ed.2d at pp. 804-805]. (487 U.S. at p. 484 [101 L.Ed.2d at p. 431].) The *Frisby* court held it did, explaining: " 'Protestors have not been barred from the residential neighborhoods. They may enter such neighborhoods, alone or in groups, even marching. . . . They may go door-to-door to proselytize their views. They may distribute literature in this manner . . . or through the mails. They may contact residents by telephone, short of harassment," (*Frisby, supra,* at p. 484 [101 L.Ed.2d at p. 431], quoting the appellants' brief.)

In other cases relied on by the Center, courts have also insured that alternative means of communication exist. For example, in *Bering* v. *Share, supra,* 721 P.2d 918, an injunction prohibited antiabortion picketing directly in front of a medical clinic. However, the Washington Supreme Court expressly recognized the need for ample alternative means of communication. (*Id.,* at pp. 930-931.) The injunction permitted picketing away from the clinic entrance but in view of anyone entering the building. (Pp. 930-931.) The picketers therefore had a ready means of reaching their chosen audience. (*Ibid.*)

Similarly, in *Portland Fem. Women's H. Ctr.* v. *Advocates For Life* (9th Cir. 1988) 859 F.2d 681, the injunction removed picketers from the 25 feet of sidewalk immediately in front of the clinic's doors only. (*Id.,* at pp. 684, 686.) However, picketers were free to use the area to either side of that strip in view of persons entering the clinic. (*Ibid.*)

Again, in *National Anti-Drug Coalition, Inc.* v. *Bolger* (7th Cir. 1984) 737 F.2d 717, the court upheld a federal regulation prohibiting solicitation on Postal Service property but concluded the regulation "provides more than ample alternative channels for the free expression of speech." (*Id.,* at p. 727.) The court pointed out that the regulation allowed citizens who

complied with state law to solicit contributions or sell literature on the municipal sidewalks adjacent to postal property. (*Ibid.*)

The Center also relies on *Dallas Ass'n., etc.* v. *Dallas Cty. Hosp. Dist.* (5th Cir. 1982) 670 F.2d 629, for the rule that expression which interferes with the functioning of a hospital may be prohibited. Even there, however, the court recognized that hospitals "should set forth standards that allow some freedom of expression outside patient areas, *for example on the sidewalks* and in parking lots, that would cause little harm or disturbance to the hospital's operation." (P. 632, italics added.)

These cases are consistent with the constitutional directive that requires ample alternative means of communication before speech in a public forum can be restricted.[4]

 It has been widely recognized that ample alternative channels of communication do not exist if a speaker's target audience is altogether insulated from the speaker's message. (See, e.g., *Prisoners Union* v. *Department of Corrections* (1982) 135 Cal.App.3d 930, 936 [185 Cal.Rptr. 634]; *Albany Welfare Rights Organization* v. *Wyman* (2d Cir. 1974) 493 F.2d 1319, 1323, cert. den., 419 U.S. 838 [42 L.Ed.2d 64, 95 S.Ct. 66]; *Wolin* v. *Port of New York Authority* (2d Cir. 1968) 392 F.2d 83, 90, cert. den., 393 U.S. 940 [21 L.Ed.2d 275, 89 S.Ct. 290].) That is the case here. The Center performs abortions only on Saturdays. The Center made no showing that defendants had any means of reaching their target audience—women obtaining abortions—if defendants were excluded from the vicinity of the Center on Saturdays. Under Code of Civil Procedure section 527, subdivision (a) it was incumbent on the Center to "show satisfactorily that sufficient grounds exist" for the issuance of the injunction. (See 6 Witkin, Cal. Procedure, *op. cit. supra,* Provisional Remedies, § 307, pp. 260-261; see *Casmalia Resources, Ltd.* v. *County of Santa Barbara* (1987) 195 Cal.App.3d 827, 838 [240 Cal.Rptr. 903, 67 A.L.R.4th 809]; *Pearson* v. *Baldwin* (1954) 125 Cal.App.2d 670, 673 [270 P.2d 866].) Since the avail-

---

[4]Other cases cited by the Center are inapposite because they *dis*approve restrictions on speech. Thus, in *Annenberg* v. *Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637 [113 Cal.Rptr. 519], the court held that the trial court erred in enjoining all peaceful picketing in front of a private residence. (*Id.,* at p. 648.) In *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353] the court held that petitioners, who were distributing leaflets in a railroad station, were wrongly convicted under an unconstitutional trespass ordinance. In *Carey* v. *Brown* (1980) 447 U.S. 455 [65 L.Ed.2d 263, 100 S.Ct. 2286], the high court invalidated a state statute limiting the picketing of residences but emphasized the court was not precluding all restrictions of picketing in residential neighborhoods. (*Id.,* at p. 470 [65 L.Ed.2d at pp. 275-276].) *Frisby,* which we have discussed, is the latest word on the subject. Finally, in *Erznoznik* v. *City of Jacksonville, supra,* 422 U.S. 205 [45 L.Ed.2d 125], the court declared unconstitutional a city ordinance that prohibited showing films containing nudity by a drive-in movie where the screen was visible from a public place.

ability of alternative means of communicating with clients was indispensable to the injunctive relief sought by the Center, it was the Center's burden to show the available alternative.

■ The Center contends women about to undergo abortion are not a legitimate target audience. The Center relies on the adverse emotional impact experienced by some of its clients. (Compare *Bering, supra,* 721 P.2d at pp. 928-930; *Portland Fem. Women's H. Ctr.* v. *Advocates for Life, supra,* 859 F.2d at p. 684.) However, we note that the trial court's injunction is tailored to restrain much of the abusive conduct described in the record. The Center has made no showing that the preliminary injunction, as amended, has been ineffective in reducing the emotional trauma experienced by clients entering the Center. As for the emotive impact of defendants' factual information, we note that the Center's clients are presumably competent to consent to medical treatment and therefore to evaluate the pros and cons of desired medical procedures. (See *Truman* v. *Thomas* (1980) 27 Cal.3d 285, 291 [165 Cal.Rptr. 308, 611 P.2d 902]; *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242 [104 Cal.Rptr. 505, 502 P.2d 1].) We cannot say the Center's clients should be deprived, as a matter of law, from receiving factual material reasonably bearing on their decision. ■ An injunction limiting citizens' rights of speech must be narrowly drawn. (*In re Berry* (1968) 68 Cal.2d 137, 155 [65 Cal.Rptr. 273, 436 P.2d 273]; *Bering* v. *Share, supra,* 721 P.2d at pp. 929-930, 935-936; see *United States* v. *Grace* (1983) 461 U.S. 171, 177 [75 L.Ed.2d 736, 744, 103 S.Ct. 1702].) The trial court did not abuse its discretion by declining to enjoin all communication between defendants and the Center's clients and by fashioning narrower orders aimed specifically at the causes of the clients' emotional distress.

■ The Center next contends even if it had to show that defendants had a reasonable way of communicating with clients, the Center made such a showing. Thus, the Center claims defendants have the alternative of assembling at the Center on days when abortions are not being performed. However, no *evidence* in the record suggests defendants' target audience is present at the Center on those days and would receive defendants' message. A preliminary injunction is properly issued only upon an adequate *evidentiary* showing. (Code Civ. Proc., § 527, subd. (a); *Ancora-Citronelle Corp.* v. *Green* (1974) 41 Cal.App.3d 146 [115 Cal.Rptr. 879]; cf. *Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1090 [223 Cal.Rptr. 410].) None was made here.

At oral argument, in this court, the Center asserted it was precluded from making such a showing because, at the commencement of the hearing on the Center's request for a modification of the injunction, on April 25, 1986, the trial court ruled that defendants had the right to communicate to clients

*on Saturday, the day they obtained their abortions.* The record fails to sustain the argument. At the beginning of the hearing counsel for defendants argued to the court, "I would like to respond . . . to the claim that the picketers should be precluded from picketing on Saturday. [¶] They might as well be precluded from picketing at all." The court responded, "That's obvious to me counsel." Counsel for the Center made no attempt to challenge the court's remark or to offer any evidence on the point. Contrary to the Center's contention, the court's remark was not a ruling but was merely a response to a legal argument. If the Center truly wished to contest the court's observation, and to produce evidence on the point, nothing precluded it from doing so.

Similarily, later in the hearing, the court remarked by way of explanation of its views, "I think it's not unreasonable to suppose that the only way these people can exercise their right of free speech is to exercise it on Saturday." Since the court had before it no evidence suggesting defendant's right of speech could be effectively exercised other than on Saturday, the court's supposition was reasonable. The trial court did not preclude the Center from producing evidence showing viable alternative means of communication other than picketing on Saturdays.

Because the Center failed to show defendants had ample alternative means of communitcating with the Center's clients, the trial court properly concluded the Center failed to show it was likely it would ultimately prevail on the merits, i.e., obtain a permanent injunction barring defendents from the vicinity of the Center on Saturdays. Consequently, the trial court did not abuse its discretion in denying the Center its requested relief by way of preliminary injunction. (See *King* v. *Meese, supra,* 43 Cal.3d at p. 1227; *Butler* v. *County of Los Angeles* (1981) 116 Cal.App.3d 633, 640 [172 Cal.Rptr. 244].)

Viewed in its entirety, the record reflects the trial court's careful, deliberate, step-by-step approach to protecting the rights of *both* sides involved in a volatile dispute that emanates from profoundly held moral convictions on both sides. The trial court performed this task in a manner wholly consistent with the constitutional directive to fashion the narrowest possible restraint on speech. We think the trial court is to be commended.

## II

### *Defendants' Appeal*

A. *The Order of April 25, 1986*

In their appeal, defendants contend the paragraphs added to the injunction on April 25, 1986, are unlawfully vague, because the reference to "picketers" is confusing.

Defendants assert, "the term 'picketer' is used generically when banning certain actions. No attempt is made to define the class of persons included within this term." Nor, claim defendants, is it clear whether their sidewalk counseling activities fall under the classification of "picketing."

To illustrate the order's vagueness, defendants note that on a Saturday in April 1986, several "pro-choice" picketers appeared on the sidewalk outside the Center. Defendants note that, if the term "picketer" is construed to include these pro-choice demonstrators, the April order's numerical limitation of seven picketers could be exceeded by those demonstrators alone before any defendant arrives on the scene. In that way defendants assert their speech rights could be totally preempted.

The record of the April 25, 1986, hearing plainly shows that the trial court intended its order to apply only to defendants and not to other picketers who were not before the court. In response to the Center's counsel's comment about the allegation that pro-choice picketers were appearing outside the Center, the trial court stated, "Just a minute, now. [¶] All I want—the only thing that I may do today is set the number of picketers from the people involved in this litigation. [¶] That's these people (indicating); I'm not including some pro-life [*sic*] something or other or anybody else. [¶] If I find that that kind of a situation creates so many people out there that I have a problem, then I'll address it. [¶] When I set a number today that number applies to these people and only these people."

Moreover, the manner in which the trial court modified the injunction also shows it does not refer to pro-choice picketers. As we shall note later, the April amendment merely added three paragraphs and left the original February injunction intact. By the terms of its preamble, the February injunction applied to "defendants . . . and their officers, agents, representatives, employees and members, and each of them, and each and every

person acting at the direction of, or in combination *or* in concert with said defendants . . . ."[5]

Finally, the trial court doubtless used the words "picketers" to describe defendants (and their officers, etc.) because defendants had been so described during the hearing of April 25. The trial court's intent was clearly to place numerical limits on defendants (and their officers, etc.) in the vicinity of the clinic regardless of whether defendants were actually engaged in picketing.

■ While the court's intentions are clear, defendants correctly point out that, "[A] preliminary 'injunction must be definite enough to provide a standard of conduct for those whose activities are proscribed, as well as a standard for the ascertainment of violations of the injunctive order by the courts called upon to apply it.'" (*California Satellite Systems, Inc.* v. *Nichols* (1985) 170 Cal.App.3d 56, 71 [216 Cal.Rptr. 180], quoting *Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 644, 651 [83 Cal.Rptr. 35].) ■ In addition, "When restrictions in the area of free expression are at issue, an appeal to 'context' is insufficient to satisfy constitutional requirements of precision." (*In re Berry, supra,* 68 Cal.2d at p. 155.)

We shall therefore modify the injunctive orders of April 25 to provide as follows, in accordance with the trial court's stated intent: "The preliminary injunction entered February 27, 1986, is modified by renumbering paragraph (11) to paragraph (14) and by adding the following paragraphs (11), (12), and (13):

"(11) Identifying (except from prior personal knowledge) or disclosing the identity of any person approaching, entering, or leaving the Health Center at 330 Flume Street, Chico, California, or harassing any person in this fashion.

"(12) Maintaining less than a 10 foot distance from any person subject to this injunction (as described in the preamble to this order) at all times on said Flume Street between 3rd and 4th Streets, including coming to or leaving the area.

"(13) Being present on said Flume Street between 3rd and 4th Streets at any time that seven or more persons subject to this injunction (as described in the preamble to this order) are also present there."

As so modified, any uncertainty as to who is subject to the order is alleviated as is any confusion as to whether defendants' activities constitute

---

[5]Paragraphs (1), (3) and (11) of the original injunction apply to the Center; however, in those paragraphs the reference is explicit.

"picketing" as that term is commonly understood. (See *California Satellite Systems, supra,* 170 Cal.App.3d at p. 71; *Pines* v. *Tomson* (1984) 160 Cal.App.3d 370, 399 [206 Cal.Rptr. 866].)

B. *Defendants' Challenge to the Earlier Orders of February 27, 1986*

In their appeal from the order of April 25, 1986, defendants contend paragraphs (8) and (9) of the preliminary injunction entered February 27, 1986, are constitutionally overbroad and vague. Defendants never tendered this constitutional claim to the trial court. (Compare *New Tech Developments* v. *Bank of Nova Scotia* (1987) 191 Cal.App.3d 1065 [236 Cal.Rptr. 746] [motion to dissolve preliminary injunction].)

The Center contends defendants' challenge to the terms of the February order is untimely because it is brought in an appeal filed more than 60 days after the Center served defendants notice of entry of the February judgment (order). (Cal. Rules of Court, rule 2(a); references to rules are to California Rules of Court.) We agree.

The order of February 27, 1986, granting the preliminary injunction, was an appealable order. (Code Civ. Proc., § 904.1, subd. (f).) Rule 2(a) provides in pertinent part: "Except as otherwise provided by Code of Civil Procedure section 870 or other statute, a notice of appeal shall be filed . . . within 60 days after the service of written notice of entry of judgment by any party upon the party filing the notice of appeal, . . . unless the time is extended as provided in rule 3."

The Center served defendants with notice of entry of the February 27 order on that date and defendants do not contend that the Center's notice was defective. Thus, defendants had 60 days thereafter in which to appeal to this court. They filed their notice of appeal on July 9, 1986, well beyond the 60-day limit.

We perceive no reason why defendants should be able to use the order of April 25, amending the injunction, as an artificial springboard from which to launch an appeal that could have been taken earlier. As pertinent, Code of Civil Procedure section 904.1, subdivision (f) authorizes an appeal from "an order granting . . . an injunction." An order modifying a preliminary injunction is appealable as "an order granting an injunction." (See *People* v. *Associated Oil Co.* (1931) 212 Cal. 76, 77-78 [297 P. 536].) Here, the April 25 order granting the (modified) injunction merely added three additional paragraphs to the original preliminary injunction, and these are without

question a proper subject of defendants' appeal.[6] However, the order of April 25 made no change in the earlier order of February 27. The provisions of the earlier preliminary injunction were simply ordered "to remain in full force and effect." Defendants make no claim that the order of April 25 contributed to the asserted vagueness in the earlier orders challenged by defendants.

We are persuaded that rules developed in an analogous context—whether an appeal may be taken from a motion to set aside a judgment under Code of Civil Procedure section 473—demonstrate that defendants' challenge to the original preliminary injunction should not be maintained. Ordinarily, an appeal may be taken from an order entered after an appealable judgment. (Code Civ. Proc., § 904.1, subd. (b); *Rooney* v. *Vermont Investment Corp.* (1973) 10 Cal.3d 351, 358 [110 Cal.Rptr. 353, 515 P.2d 297].) ▮ However, "An order denying a motion to vacate an appealable judgment [under Code of Civil Procedure section 473] is generally not appealable if such appeal raises only matters that could be reviewed on appeal from the judgment itself. The reason for this general rule is that to allow the appeal from the order of denial would have the effect of allowing two appeals from the same ruling and might in some cases permit circumvention of the time limitations for appealing from the judgment. [Citations.]" (*Rooney* v. *Vermont Investment Corp., supra,* 10 Cal.3d at p. 358; see *Litvinuk* v. *Litvinuk* (1945) 27 Cal.2d 38, 44 [162 P.2d 8]; *Title Ins. & Trust Co.* v. *Calif. etc. Co.* (1911) 159 Cal. 484, 487-488 [114 P. 838]; *Rojes* v. *Riverside General Hospital* (1988) 203 Cal.App.3d 1151, 1161 [250 Cal.Rptr. 435]; 9 Witkin, Cal. Procedure, *op. cit. supra,* Appeal, § 111, pp. 128-129).

▮ The general rule controls here. To allow defendants to challenge the subject paragraphs of the earlier preliminary injunction would allow them two appeals on identical grounds. Moreover, if defendants' theory were allowed, it would theoretically allow wholesale challenges to a preliminary injunction many years after its entry, merely because a court modified the injunction in some insignificant manner and even though the trial court was never given a chance to cure the asserted illegality. (Compare *New Tech Developments* v. *Bank of Nova Scotia, supra,* 191 Cal.App.3d at pp. 1070-1071.) In the absence of some showing as to how the amendment of the injunction affected the challenged paragraphs, and in the absence of a motion by defendants to dissolve the paragraphs, we can think of no reason why defendants should be able to avoid the ordinary time to appeal from the order entering the preliminary injunction.

Our conclusion is buttressed by cases allowing appeals from orders modifying injunctions. So far as we can tell, the courts of this state have enter-

---

[6] We earlier denied the Center's motion to dismiss defendants' entire appeal because defendants had timely challenged the three orders of April 25.

tained such appeals where (1) the later orders have modified an injunction "in important particulars" (*Cherry Hill Gold Min. Co.* v. *Baker* (1905) 147 Cal. 724 [82 P. 370]) and the appeal challenges the modifications (see, e.g., *Barrett* v. *Lipscomb* (1987) 194 Cal.App.3d 1524, 1528 [240 Cal.Rptr. 336]; *Palo Alto-Menlo Park Yellow Cab Co.* v. *Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 129 [135 Cal.Rptr. 192]; *West Coast Constr. Co.* v. *Oceano Sanitary Dist.* (1971) 17 Cal.App.3d 693, 698 [95 Cal.Rptr. 169]); or (2) the appeal may have been timely even if taken from the original injunction (e.g., *People* v. *Associated Oil Co., supra,* 212 Cal. at p. 77); or (3) the appellant contested the *procedures* by which the injunction was modified (e.g., *Christopher* v. *Condogeorge* (1900) 128 Cal. 581, 584-585 [61 P. 174]; *Hobbs* v. *Amador and Sac. C. Co.* (1884) 66 Cal. 161, 163 [4 P. 1147]). We have been cited no case, nor are we aware of one in California, in which an appeal such as that pressed by defendants has been allowed.

 Defendants rely on *American Ins. Co.* v. *Gernand* (1968) 262 Cal.App.2d 300 [68 Cal.Rptr. 810], which held that a failure to appeal provisions of a preliminary injunction did not preclude later review of a subsequent permanent injunction. (P. 305.)

However, entry of a permanent injunction involves different procedures from a preliminary injunction and therefore requires new review.[7] A preliminary injunction is designed to preserve the status quo pending a determination on the merits. (6 Witkin, *op. cit. supra,* Provisional Remedies, § 248, p. 215.) Its propriety is governed by rules, noted above, that are peculiar to the provisional remedy. (See *IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69-70.) Importantly, a ruling on a preliminiary injunction does not ordinarily entail final adjudication of the ultimate rights in controversy. (*King* v. *Meese, supra,* 43 Cal.3d at p. 1227; *Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at p. 286.) That adjudication normally occurs following a hearing on the merits, at which time a trial court may enter a permanent injunction. (See Code Civ. Proc., § 526; 38 Cal.Jur.3d, Injunctions, § 15, p. 483.) When the trial court does so, it enters an entirely new order, in the nature of a judgment (*San Diego W. Co.* v. *Steamship Co.* (1894) 101 Cal. 216, 220 [35 P. 651]; 6 *Witkin, op. cit. supra,* Provisional Remedies, § 250, pp. 216-217), from which an appeal may be appropriately taken to contest the conduct of the trial and the adjudication of the merits of the dispute.[8]

---

[7] *Gernand, supra,* 262 Cal.App.2d 300, 305, is also distinguishable on its facts. There, the terms of the permanent injunction varied from the terms of the preliminary injunction. The preliminary injunction restrained defendants from proceeding with arbitration of a demand "now before" an arbitration association. (*Ibid.*) The permanent injunction restrained defendants from proceeding with arbitration of *any* claim. (*Ibid.*) Thus, the permanent injunction in *Gernand* contained a substantively different order from that in the preliminary injunction.

[8] That is what happened in a different context in *Karsh* v. *Superior Court* (1932) 124 Cal.App. 373 [12 P.2d 658], cited by defendants. The case is therefore inapposite.

By their citation to *Socol* v. *King* (1949) 34 Cal.2d 292 [209 P.2d 577] and *Amell* v. *Amell* (1937) 10 Cal.2d 153 [73 P.2d 888], defendants may be contending that the Center's motion to modify the preliminary injunction was, in effect, a motion to vacate a judgment under Code of Civil Procedure section 663 so that their time to appeal was extended pursuant to rule 3(b).[9] However, the Center's motion was not such a motion. Under Code of Civil Procedure section 663, the motion may be premised on an "Incorrect or erroneous legal basis for the decision, not consistent with or not supported by the facts;" or on "A judgment or decree not consistent with or not supported by the special verdict." (*Ibid.*) Neither ground is applicable here.

■■■■ Defendants also contend their challenge to the February order should not be dismissed because the February order must be read in pari-materia with the April order. However, our conclusion that defendants' challenge is untimely does not preclude our consideration of the February order for purposes of interpreting the April order.

Defendants also contend our consideration of their contentions will serve the interests of judicial economy. However, we believe those interests will be best served by limiting our consideration to matters which are timely brought before us.

By their citation to *Jarkieh* v. *Badagliacco* (1945) 68 Cal.App.2d 426 [156 P.2d 969], defendants apparently urge this court to grant them relief from default in failing to bring a timely appeal. However, *Jarkieh* involved the discretion of an appellate court to relieve an appellant from default for failure timely to prepare the record on appeal. (*Id.*, at p. 428.) We have no discretion to relieve defendants from their tardiness in filing a late notice of appeal. Rule 45(e) provides in pertinent part that "The reviewing court for good cause may relieve a party from a default occasioned by any failure to comply with these rules, *except the failure to give timely notice of appeal.*" (Italics added.) "[T]he requirement as to the time for taking an appeal is mandatory, and the court is without jurisdiction to consider one which has been taken subsequent to the expiration of the statutory period. [Citations.]" (*Estate of Hanley* (1943) 23 Cal.2d 120, 122 [142 P.2d 423, 149 A.L.R. 1250]; followed in *Hollister Convalescent Hosp., Inc.* v. *Rico* (1975)

---

[9]Rule 3(b) provides: "When a valid notice of intention to move to vacate a judgment or to vacate a judgment and enter another and different judgment is served and filed by any party on any ground within the time in which, under rule 2, a notice of appeal may be filed, or such shorter time as may be prescribed by statute, the time for filing the notice of appeal from the judgment is extended for all parties until the earliest of 30 days after entry of the order denying the motion to vacate; or 90 days after filing the first notice of intention to move to vacate the judgment; or 180 days after entry of the judgment."

15 Cal.3d 660, 674 [125 Cal.Rptr. 757, 542 P.2d 1349]; see *Pressler* v. *Donald L. Bren Co.* (1982) 32 Cal.3d 831, 835 [187 Cal.Rptr. 449, 654 P.2d 219].) *United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902 [122 Cal.Rptr. 877, 537 P.2d 1237], cited by defendants, is inapposite because it involved a request for relief by way of extraordinary writ. (*Id.,* at p. 906.) Defendants' challenges to the February order are untimely and may not be considered.

### DISPOSITION

As modified above, the order of April 25, 1986, is affirmed. To the extent defendants attempt to appeal from the February 27, 1986, order the appeal is dismissed. Each party shall bear its own costs on appeal.

Puglia, P. J., and Carr, J., concurred.