This case originated in the District Court of Montgomery County, where appellant was tried on a charge of disturbing an "assemblage of people met for religious worship." On appeal from his conviction to the Circuit Court of Montgomery County, he was tried on an information that followed the form prescribed by Code 1975 § 15-8-150 (46), which is expressly applicable to Code 1975 § 13-6-102:
 "Any person who wilfully interrupts or disturbs any assemblage of people met for religious worship, by noise, profane discourse, rude or indecent behavior or any other act, at or near the place of worship, shall, on conviction, be fined not less than $20.00 nor more than $200.00 and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than six months."
A jury found him guilty as charged, and the trial court fixed his punishment at six months imprisonment in the Montgomery County Jail and sentenced him accordingly.
A major insistence of appellant is that the law under which defendant was charged, tried and convicted, Code 1975, § 13-6-102, "is so vaguely worded as to fail to give fair notice of which acts the statute is meant to punish." If the particular Section of the Code were a new, an unused and untested provision of law, it is conceivable that some people would not comprehend fully "what acts would be punished under this particular statute." The "particular statute" has been in every Code of Alabama since the Code of 1852, without change "in one jot or one tittle." There have been many trials of violations of the statute, many reported cases and doubtless many more unreported ones. Appellant cites no case in which any serious question has been raised as to the sufficiency of the statute to withstand an attack thereon on the ground of vagueness. It is difficult to reconcile the theory that it is too vague to be understood by rational people when in fact it has been understood by them almost without exception for more than a century.
We do not overlook the principle, or the cases supporting it, that "[Reasonable c]ertainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." Scull v. Virginia, 359 U.S. 344, 79 S.Ct. 838,3 L.Ed.2d 865, 871 (1959). It is also to be recognized that the right of freedom of expression in Alabama, as elsewhere, has been precious in the minds of its people from the time the particular statute was adopted, and even long before, but few, if any, of the people who have been charged under the statute have challenged it on the ground that it was not understandable by reasonable people.
 "A criminal statute is not rendered unconstitutional by the fact that its application may be uncertain in exceptional cases, nor by the fact that the definition of the crime contains an element of degree as to which estimates might differ, or as to which a jury's estimate might differ from defendant's, as long as the general area of conduct against which the statute is directed is made plain. It is not violative of due process of law for a legislature in framing its criminal law to cast upon the public the duty of care and even of caution, provided there is sufficient warning to one bent on obedience that he comes near the proscribed area. Nor is it unfair to require that one who goes perilously close to an area of proscribed conduct take the risk that he may *Page 208 
cross the line." 21 Am.Jur.2d Criminal Law, § 17 p. 100.
We doubt that there are any, and are confident that there are not many, statutorily defined crimes that can be more readily understood by reasonable people than the one now under consideration, the old, the young, the rich and the poor, the learned and the unlearned, wherever they may be.
The question as to the vagueness of the statute was raised by defendant's motion to quash the information. The trial court was not in error in overruling the motion or in ruling against defendant on the particular point in any other motion or request by defendant.
Appellant also insists that the statute as applied to his conduct is "in violation of the Constitution of the United States and Alabama in that it completely disregards the separation of Church and State and infringes upon the Defendant's First and Fourteenth Constitutional Amendment rights of freedom of speech and expression."
There was little, if any, dispute as to the material facts. According to the evidence, defendant and a few others, who lived in Montgomery, had voiced a difference between them and the First Baptist Church of Montgomery that resulted in a picketing of the church building by walking up and down the sidewalk immediately adjacent to the large flight of stone steps leading up to the front of the church building. Defendant had contacted the authorities of the city, including Mayor Folmar, as to a picketing permit. It seems that it was definitely and clearly understood by and between the authorities and the picketers, including defendant, that they should stay off the church property and out of the church building in their picketing activities, but that they would not be prohibited from picketing on the sidewalk. How many times they had engaged in picketing in front of the church is not clearly shown, but they had done so on Sunday, two weeks before Sunday, January 7, 1979, when the alleged offense was committed.
The services at the church commenced at 11:00 A.M. each Sunday.
According to the testimony of Mr. Boyd Christenberry, the chairman of the Board of Deacons of the First Baptist Church, he attended the 11:00 services; as he left the sanctuary at the conclusion of the services he saw defendant picketing on the sidewalk in front of the church with a mounted placard[1] in his hands. He then saw defendant proceed up the steps with the placard, and he was met on the steps by the chairman of the Board of Ushers, Mr. Fred Waldo. Mr. Waldo told the defendant that he could go in the church, but not with the sign he was carrying. Still carrying the sign, defendant went into the vestibule where he was arrested by the police. This testimony in material respects was corroborated by that of Mr. Waldo and in general was corroborated by the testimony of defendant himself. It is made reasonably clear by the evidence that the activities of defendant and others in picketing in front of the First Baptist Church, as well as at some other places in Montgomery, had brought about the need in the view of the authorities, for a detail of policemen at the church on the morning of January 7, 1979. The Mayor, the Chief of Police, and Sergeant R.H. Hankins of the Police Department were there.
Sergeant Hankins testified that at approximately 11:50 o'clock he saw defendant picketing in front of the church and carrying a sign. He said they exchanged greetings. His testimony continued as follows:
 "Q. Would you please state to your own personal knowledge of what the defendant stated on that date to you?
"A. He said, `What will I have to do to be arrested?
"Q. And what was your reply, if anything? *Page 209 
 "A. I told him he could not go into the church with the placard. It had been told to me that he was welcome provided he would come inside without the placard but that he could not take the placard inside.
"Q. Okay. And where were you when you told him this?
 "A. On the sidewalk immediately in front of the church.
 "Q. What time did the church services end on that day?
"A. 12:00 or thereabouts. 12:00.
 "Q. Alright, Sir. And at that point in time was the Defendant still present outside in front of the church picketing?
"A. Yes, Sir.
 "Q. Okay, Sir. What if anything did you observe the defendant do after the congregation had started leaving the church?
 "A. Came up the stairs and started talking to Mr. Waldo, who was the Chairman of the Board of Ushers, I believe they call it.
 "Q. Were you in close proximity to Mr. Waldo and the Defendant?
"A. Yes, sir.
"Q. Approximately how far away were you?
"A. No more than three or four feet.
 "Q. Okay, Sir, did the Defendant have anything in his possession at that time?
"A. Yes, Sir.
"Q. What did he have?
"A. The placard.
". . . .
"Q. Okay, what if anything did you hear?
 "A. Mr. Waldo told Mr. Hill that he was welcome inside the church but that he could not carry the sign inside.
 "Q. Okay, did you hear any reply from the Defendant, Mr. Hill?
"A. Not that I recall.
"Q. Okay, what then did the Defendant do?
 "A. Just stepped to the side around Mr. Waldo and entered into the vestibule area of the church.
". . . .
 "Q. After the Defendant ignored Mr. Waldo and started walking up the steps what did you do?
 "A. After he got inside the vestibule, just inside the front door I placed him under arrest.
"Q. Okay, what then happened, if anything?
 "A. He was taken to headquarters and booked and transferred to the County Jail.
 "Q. Okay, Sergeant Hankins, during the process of the Defendant going up the steps with the placard and your subsequent arrest of the Defendant I ask you whether or not you observed any members of the congregation around the scene when this occurred?
 "A. There were several members of the congregation in the vestibule area.
 "Q. Did you know of your own personal knowledge whether or not there was still members inside the sanctuary?
 "A. There were several members in the sanctuary talking."
The testimony of defendant himself was not of any great variance in material respects from the testimony already shown, but some of his testimony should be narrated in order to understand fully the position taken by him. According to him, he had had some arguments with the pastor of the First Baptist Church of Montgomery, who also testified in the case on call of the defendant. The defendant testified that he and two others, including his brother and another, who were all members of "The Spiritual Church of Jesus Christ," met with Dr. White, pastor of the First Baptist Church of Montgomery, in the minister's study, after an appointment had been made with him through his secretary; that while there a short discussion which started out as if it would be a long one, was abruptly halted, and the visitors left. Defendant said that thereafter he arranged with others to picket the church and in doing so inquired as to his rights. They picketed the church on Christmas Eve Sunday, and he said that he talked with Mayor Folmar *Page 210 
about the activity, and the Mayor told him that he "was not to come on the first step of the church," in picketing the church. He said that he did not come upon the first step on Christmas Eve Sunday. He arrived at the church on January 7 about "a quarter until eleven" that morning. He and his brother picketed on the sidewalk in front of the church, each bearing a sign. About the time the church services ended, he started walking up the steps. His testimony continues as follows:
 "Q. All right. Let's go to the occasion where you went up the stairs to the church or up the steps and previously you testified you had been told that you would be arrested and you were not arrested, is that a fact?
 "A. Yes, Sir. That's a fact, I walked directed [sic] toward Mayor Folmar.
 "Q. Okay, did you have an occasion to encounter Mr. Waldo?
"A. Yes, I did.
"Q. Okay, what transpired between you and him?
 "A. Mr. Waldo came down to me and grabbed my sign that I had in my hand and he said You are not to come up here any further. He said, You are welcome inside the church but your sign is not.
 "Q. All right, what else was — was that all the conversation you had?
 "A. That's all the conversation with Mr. Waldo that I had. I made no further statements to him.
"Q. What did you do then?
 "A. I proceeded to the right. He let go of my sign and I walked toward the Mayor. The Mayor was directly to my right.
". . . .
"Q. Where did he go?
"A. He walked up toward the front door of the steps.
"Q. Alright.
 "A. And then right to the doors going into the corridor, so he walked up to it and he said let him come on in here so I freely walked on inside.
 "Q. Alright, at that time did you think you were going to be arrested?
 "A. No, I did not. I didn't think I was because the church services were over with and there was nobody there."
The evidence shows, and there is no contention to the contrary, that the difference between defendant and the target of his picketing activities was not a contest between the anti-religious and the religious. Whatever the nature of the difference between the two, the protesters were a group whose apparent leader conducted himself so as to manifest a belief that he could go to any length, short of personal violence, profanity or obscenity, to promote their religious views in an attempt to proselyte those of other religious views, contrary to their own expressed wishes, while assembled on their own premises.
Appellant has cited no case of the Supreme Court, the final arbiter of issues under the First Amendment, that supports, or nearly supports, his contention that to proscribe or punish his conduct is to violate the "Establishment" or "Free Exercise" provision of such Amendment. He is content with reference to, and quotations from, Gillette v. United States, 401 U.S. 437,91 S.Ct. 828, 28 L.Ed.2d 168 (1971) and Murdock v.Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1948).Gillette dealt with "conscientious objector" cases and is without applicability, in what was held or written therein, to the facts of this case. Murdock v. Pennsylvania, supra, upheld the contention of Jehovah's Witnesses that a license imposed upon them for the dissemination of their literature from door to door in the city of Jeannette, Pennsylvania, was in violation of the freedom of religion provision of the First Amendment. See also, Jones v. Opelika, 319 U.S. 103,63 S.Ct. 890, 87 L.Ed.2d 1290 (1941) vac'ng previous judgment in316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691 (1941). Appellant argues that it follows from Murdock that defendant had the constitutional right to go into the First Baptist Church, under the circumstances shown by the evidence in this case, in order to spread his religious beliefs. Neither Murdock nor any other case has held that a *Page 211 
trespass upon property is legally justifiable when committed in the course of evangelism. The most nearly the Supreme Court has ever gone in that direction was in Marsh v. Alabama,326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), in which was involved the distribution of religious literature on the streets of a "company-owned town." Considering the anachronistic nature of the town in Marsh and distinguishing the situation therein presented from the facts in Lloyd Corp. v. Tanner,407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), Mr. Justice Powell stated in the latter case:
 "Although accommodations between the values protected by these three Amendments [First, Fifth and Fourteenth] are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only. Even where public property is involved, the Court has recognized that it is not necessarily available for speaking, picketing or other communicative activities . . ." 407 U.S. at 567-568, 92 S.Ct. at 2228, 33 L.Ed.2d at 142.
On the particular point, the Supreme Court in Lloyd Corp., relied heavily upon and quoted from Adderley v. Florida,385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), as follows:
 "The state, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this `area chosen for the peaceful civil rights demonstration was not only "reasonable" but also particularly appropriate * * *.' Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, Cox v. Louisiana, [supra, 379 U.S. 536], at 554-555 and 563-564, [85 S.Ct. 453
at 464 and 480, 13 L.Ed.2d 471 at 483, 484, 491, 492]. We reject it again. The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose [emphasis supplied]." 385 U.S. at 47-48, 87 S.Ct. at 247, 17 L.Ed.2d at 156.
There are affirmative defenses to a civil trespass and special defenses to what would otherwise be a criminal trespass, but they do not include the claimed defense that one is privileged to enter upon the premises of another, without his consent express or implied, to express his views, however religious they may be. When there is an obtrusion upon an assemblage of people met for religious worship, it constitutes an invasion upon both their right "peaceably to assemble" and their freedom of religion guaranteed by the First Amendment.
There is no contention that the prosecution involves a violation of the equal protection of the laws provision of the Fourteenth Amendment, and there is no basis for any such contention. This makes inapposite such cases as Shuttlesworthv. City of Birmingham, 373 U.S. 262, 83 S.Ct. 1130,10 L.Ed.2d 335 (1961).
It is to be noted also that there is no claim that there was involved any disagreement as to any business or social relationship between the members of the First Baptist Church and the protesters, or any persons for whom they were protesting. There was no semblance of a grievance in the nature of those that have given rise to picketing activities considered in many reported cases, which furnish no precedent to follow in the instant case.
The First Amendment affords defendant no protection in what he was doing; it affords members and visitors of the church concerned freedom and security against what he was doing. It is not contemplated *Page 212 
by freedom of religion that one should be so free in the promulgation of his religious views that he can exercise unlawful force in his efforts to destroy the religious views of another. For government to support him in such efforts would tend toward the "establishment" of "religion" — in the name, but contrary to the meaning, of religious freedom.
Great emphasis is placed by appellant upon the undisputed fact that appellant's ascent of the front steps of the church and his entry into the vestibule with the picketing placard in his hands, contrary to definite directions of those in charge of the premises, occurred after the conclusion of the services and after some of the attendants had left the sanctuary and were in the process of dispersing. He argues therefrom that his conduct did not constitute a violation of Ala. Code § 13-6-102, which is entitled, "Disturbing Religious Worship," but which words are not found in the body of said Section and are to be distinguished from those in the Section itself, "disturbs any assemblage of people met for religious worship." There was still an assemblage of people who had met for religious worship. Kinney v. State, 38 Ala. 224 (1862) is dispositive of the contention of appellant in this particular respect. In following a Tennessee case based on a similar statute, the Alabama Supreme Court said in Kinney:
 "On the trial of an indictment founded on the act just cited, it was proved that after the services were over, and the congregation had been dismissed, and begun to leave, some being still in the church, some in the church-yard, and others left for home, the defendants, with others, excited and disturbed the congregation, . . . there then being present a good many ladies and gentlemen. Upon these facts, the defendants asked the court to charge, that if the worship had closed, and the congregation had been dismissed, and had begun to disperse, part having left the ground at the time the disturbance occurred, then the defendant could not be convicted. This the court refused, but charged the jury, that if the worship had ceased, and the congregation had been dismissed, then, unless a reasonable time had elapsed for the dispersion of the congregation after such dismission, the defendants would be guilty, if they did acts calculated to disturb those on the grounds. On appeal to the Supreme Court, it was decided, that there was no error in the rulings of the circuit judge; the court holding, that the act not only protects from disturbance a congregation while actually engaged in worship, but extends its protection also to all congregations which had assembled for the purpose of worshipping; and that this protection continues, from the time the congregation so assembles, until it disperses and ceases to be a congregation. — Williams v. State, 3 Sneed, 313.
 "This decision, which we readily adopt as a correct construction of our own statute, is precisely in point in the present case, and shows that the court did not err in refusing the charge asked by the defendant." [Emphasis supplied]
We decline to hold otherwise. "Remove not the ancient landmark, which thy fathers have set." Prov. XXII:28.
With some possible exceptions, there is generally an assemblage of the worshippers before the services commence, and the assemblage continues for a reasonable time after the amen of the benediction, or the particular services terminate otherwise.
A more difficult problem than any considered above is to be found in the following sentence in appellant's brief:
 ". . . His acts were not reckless nor malicious and if the law was broken at all, it was a borderline case and the actions complained of were committed by the Defendant merely to promulgate his religious beliefs and ideas and not for any selfish or malicious reason. . . ."
It is not for us to take issue with any of such statement, not even with the statement that this is a "borderline" case. To the credit of all concerned it can be said that none of the members of the church or the city authorities present treated defendant as if he were acting selfishly and maliciously. *Page 213 
They conducted themselves gentlemanly and treated him accordingly.
Malicious malice and selfishness are not essential elements of the crime. Wilfulness is, and it is conceivable that defendant had good reason to doubt that he was violating the law. It may have been hard for him to distinguish between what he apparently was accorded the right to do on a public sidewalk and what he deemed to be his right on the steps of the church. At that time it would have been more nearly a borderline case than when he entered the vestibule with the picketing placard in his hand, on his way to the auditorium in which the services were conducted. It appears that the officers waited until all doubt had been removed as to his violation of the law and as to whether he had crossed the border line between law observance and law violation. Whether he had done so before he entered the vestibule is not an issue before us, but that he did so wilfully was the judgment of the District Court, the finding of the jury to whom the trial court properly submitted the issue. It also properly overruled defendant's motion for a new trial. We agree with the actions taken. Whatever right there may have been in the mind and conscience of defendant, he was wrong in law in what he did.
The contention of appellant that he should have been tried under Ala. Code § 13-2-105, instead of § 13-6-102, misses its mark. Section 13-2-105 is entitled, "Entering or remaining in church or on church premises contrary to request." The two Sections are for different purposes and embrace different acts or activities. The evidence shows that he would not have been guilty of violating Section 13-2-105, for the reason that, in their kind consideration of appellant, they had never requested that he not enter or remain in church or on the premises. On the contrary, they expressly stated to him that he was welcome there as a visitor, a worshipper, or as an observer, but not as a picketer with a placard.
Appellant challenges the severity of the punishment imposed upon him by the trial court. This question is not within our province to decide. Perhaps we should observe, however, that the entire proceedings we have reviewed indicate no hatred, no ill will, no spirit of vindictiveness on the part of anyone concerned.
We find no error in the record. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is
AFFIRMED.
All the Judges concur.
[1] It appears that the placard, and other signs, bore citations to, but not quotations from, the New Testament.