[No. B158554. Second Dist., Div. One. July 2, 2002.]

CHURCH OF CHRIST IN HOLLYWOOD et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LADY CAGE-BARILE, Real Party in Interest.

## COUNSEL

Hartzler & Hartzler, Mark B. Hartzler; The Becket Fund for Religious Liberty, Derek L. Gaubatz, Eric Treene, Roman Storzer and Christine Lockhart for Petitioner.

No appearance for Respondent.

No appearance for Real Party in Interest.

## OPINION

**MALLANO, J.**—In the trial court, a church sought a restraining order to prevent an expelled member from engaging in disruptive conduct on church property. The trial court denied relief, finding that the right of free speech permitted the former member to enter the premises and express her contrary religious views. The trial court also found that the parties' dispute involved religious doctrine, precluding the intervention of civil courts.

We conclude that the church, like any nonsectarian property owner, may decide whom to allow on its premises. Nor does this case require the resolution of a dispute over religious doctrine. Accordingly, we direct the trial court to grant the requested relief.

### I

### BACKGROUND

The Church of Christ in Hollywood (Church), located at 600 North Rossmore Avenue in Los Angeles, is a nonprofit religious corporation.

Dr. Daniel A. Rodriguez is the minister. Pursuant to a set of bylaws, the Church is governed by a board of trustees, including officers such as president, secretary, and treasurer. The Church owns the land on which it is situated.

Lady Cage-Barile is a former member of the congregation who disagrees with how Dr. Rodriguez and others guide the Church. Commencing in January 2001, and continuing to the present, Cage-Barile has engaged in disruptive conduct on Church premises. Sometimes she enters the Church and follows certain members, shouting that they are adulterers, agents of Satan, and demon worshipers. She has shouted at Dr. Rodriguez and Church leaders, calling them Satan's agents because they allow divorced and remarried persons to participate in Church ministries. Members of the young adult ministry are so intimidated by her conduct that they meet secretly; those wishing to attend must dial a central telephone number to learn the time and location of the meeting.

On one occasion, Cage-Barile confronted a married couple inside the Church, saying that they were adulterers, living in sin, and would not go to heaven. Later, when the couple was leaving, they had trouble starting their car. Cage-Barile yelled out that "things happen" to people who live in sin and that the car would not start because God was punishing them.

Dr. Rodriguez and others have repeatedly asked Cage-Barile not to return to the Church. Dr. Rodriguez has asked her to attend services at a different church—one where she will respect the leadership. Cage-Barile has refused these requests and said she will not change her behavior.

In January 2002, the Church held a noticed meeting, to which the entire congregation was invited, in order to address Cage-Barile's membership. She was allowed several hours to present her views. Church leaders conducted the meeting in accordance with all corporate requirements. At the end of the meeting, the Church voted to terminate Cage-Barile's membership.

By letter to Cage-Barile dated February 16, 2002, the Church informed her that "this letter constitutes formal written notice to you that your membership at the Church of Christ [in] Hollywood is terminated. You are no longer a member of this particular Church. You may not participate in Church activities, you may not vote, and you may not petition members. The termination procedures allowed by law were followed, you were allowed a hearing, and the board and membership reached a decision to terminate your membership in January 2002."

The letter continued: "[T]his letter constitutes . . . [a] demand that you immediately cease and desist from your incessant harassment and intimidation of the Minister, the leaders, the Trustees, and the membership. . . .

You are specifically not welcome to enter upon the Church premises . . . . If you attempt to enter upon the Church premises, you will be considered a trespasser."

The letter proved fruitless. Cage-Barile continued to disrupt worship services. In the words of Dr. Rodriguez, "Lady Cage-Barile's actions and course of conduct have caused me to suffer substantial emotional distress. I feel tense delivering sermons. Her constant harassment has made it extremely difficult for me to minister to my congregation. I have trouble concentrating because I know she will confront me before, during, and after worship services or Bible study." For example, after one particular sermon, Cage-Barile shouted at Dr. Rodriguez, telling him to preach from the Bible.

As a result of Cage-Barile's conduct, the Church has lost members. Some of the members and children are frightened by her conduct, causing the Church to cancel ministries or hold meetings in secret. The Church cannot freely hold events on its property.

On February 23, 2002, during services, Church leaders called the Los Angeles Police Department to prevent Cage-Barile from entering the property. While waiting for the police, she stated repeatedly that she would continue her actions because the Church did not have a court order preventing her from entering the premises. After the police arrived, Cage-Barile stood on the grass outside the Church, accusing Dr. Rodriguez of doing the devil's work and referring to some of the Church members as demons. The congregation could not leave the Church until the problem with Cage-Barile was temporarily resolved.

On February 28, 2002, the Church and Dr. Rodriguez filed this action against Cage-Barile, seeking injunctive relief to bar her from (1) impeding ingress or egress on Church premises, (2) trespassing on Church property, and (3) approaching within 10 yards of, intimidating, interfering with, oppressing, or otherwise threatening the membership or leadership of the Church as they enter or exit the Church premises. The Church gave Cage-Barile proper notice that it would be appearing in the trial court to seek a restraining order. Cage-Barile did not appear or file any papers.

Meanwhile, on March 31, 2002, Cage-Barile was seen removing Easter-related announcements from the Church bulletin board and tearing them up. A Church official asked her to stop it. She replied, "[T]here is no Easter in the Bible," and continued to remove all of the remaining announcements. The missing items were soon replaced. Cage-Barile tore them down again. She did the same thing a week later.

At a hearing on April 12, 2002, the trial court found that Cage-Barile was "making an absolute pest and nuisance of herself by shouting insults at the members of the congregation" and that she "has torn some things down off the bulletin board." Nevertheless, the trial court denied the Church's application for a temporary restraining order and an order to show cause, stating that the requested relief, if granted, would interfere with Cage-Barile's constitutional right of free speech (U.S. Const., 1st Amend.; Cal. Const., art. I, § 2, subd. (a)) and would entangle the court in a doctrinal dispute, contrary to *Metropolitan Philip v. Steiger* (2000) 82 Cal.App.4th 923 [98 Cal.Rptr.2d 605] and *Korean Philadelphia Presbyterian Church v. California Presbytery* (2000) 77 Cal.App.4th 1069 [92 Cal.Rptr.2d 275].

On May 13, 2002, the Church and Dr. Rodriguez filed a petition for writ of mandate with this court, seeking a peremptory writ directing the trial court to grant the relief sought in the complaint. On May 24, 2002, we issued an order to show cause why the trial court's ruling should not be vacated. We also established a briefing schedule and calendared the matter for oral argument. Cage-Barile did not file any papers or appear for argument. Having considered petitioners' oral and written presentations, we now consider the merits of the petition.

II

DISCUSSION

"The law is well settled that the decision to grant [a restraining order] rests in the sound discretion of the trial court." (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121] (*IT Corp.*).) "A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' " (*Ibid.*) "Further, the burden rests with the party challenging the [trial court's order] to make a clear showing of an abuse of discretion." (*Ibid.*)

"[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue [a restraining order]. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the [restraining order] were denied as compared to the harm that the defendant is likely to suffer if the [order] were issued." (*IT Corp., supra*, 35 Cal.3d at pp. 69-70.)

"The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on

one, the less must be shown on the other to support [a restraining order]. . . . Of course, '[t]he scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits.' . . . A trial court may not grant a [restraining order], regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim." (*Butt v. State of California* (1992) 4 Cal.4th 668, 678 [15 Cal.Rptr.2d 480, 842 P.2d 1240], citations omitted.)

Appellate review of an order *granting* a restraining order involves a limited review of these two factors: the likelihood of success on the merits and interim harm. If the trial court abused its discretion on either factor, the Court of Appeal must reverse. (*Carsten v. City of Del Mar* (1992) 8 Cal.App.4th 1642, 1649 [11 Cal.Rptr.2d 252].)

On the other hand, when a trial court *denies* an application for a restraining order, "it implicitly determines that the plaintiffs have failed to satisfy either or both of the 'interim harm' and 'likelihood of prevailing on the merits' factors. On [appellate review], the question becomes whether the trial court abused its discretion in ruling on *both* factors. Even if the appellate court finds that the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other." (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286-287 [219 Cal.Rptr. 467, 707 P.2d 840].)

A. *Success on the Merits*

The Church's principal claim against Cage-Barile is one for trespass. " 'The essence of the cause of action for trespass is an "unauthorized entry" onto the land of another. Such invasions are characterized as intentional torts, regardless of the actor's motivation. Where there is a consensual entry, there is no tort, because lack of consent is an element of the [theory underlying the tort]. "A peaceable entry on land by consent is not actionable." . . .' " (*Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1480 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027], citation omitted.) Cage-Barile was frequently told by Church leaders not to return to the property. She did so anyway, without consent.

1. *Free Speech*

Cage-Barile's right of free speech does not trump the Church's right to prohibit her disruptive conduct on its property. Indeed, "[e]very person who intentionally disturbs or disquiets any assemblage of people met for religious

worship at a tax-exempt place of worship, by profane discourse, rude or indecent behavior, or by any unnecessary noise, either within the place where the meeting is held, or so near it as to disturb the order and solemnity of the meeting, is guilty of a misdemeanor punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail for a period not exceeding one year, or by both that fine and imprisonment." (Pen. Code, § 302.)

" 'The examples are many of the application . . . of the principle that certain forms of conduct mixed with speech may be regulated or prohibited. The most classic of these was pointed out long ago by Mr. Justice Holmes: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." . . . A man may be punished for encouraging the commission of a crime, . . . or for uttering "fighting words," . . . . These authorities make it clear . . . that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." . . .'

■ "Criminal laws penalize conduct. If the conduct is permissibly prohibited under the state and federal Constitutions, the fact that the conduct may peripherally involve speech or association does not cloak it with constitutional protections that invalidate the criminal statute prohibiting the conduct." (*People v. Pulliam* (1998) 62 Cal.App.4th 1430, 1438-1439 [73 Cal.Rptr.2d 371], citations omitted.)

" '[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. . . . In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is " 'communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs. . . .' " . . . As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. . . . [¶] A threat is an " 'expression of an intent to inflict evil, injury, or damage on another.' " . . .' " (*People v. Toledo* (2001) 26 Cal.4th 221, 233 [109 Cal.Rptr.2d 315, 26 P.3d 1051], citations and italics omitted.)

■ "Although . . . the courts properly have shown a special solicitude for the guarantees of the First Amendment, [the United States Supreme

Court] has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned . . . ." (*Lloyd Corp. v. Tanner* (1972) 407 U.S. 551, 567-568 [92 S.Ct. 2219, 2228, 33 L.Ed.2d 131].) "As a general rule, landowners . . . have a right to exclude persons from trespassing on private property; the right to exclude persons is a fundamental aspect of private property ownership." (*Allred v. Harris* (1993) 14 Cal.App.4th 1386, 1390 [18 Cal.Rptr.2d 530].)

 In a case similar to this one, a protester entered a church carrying a placard containing citations to the New Testament. He was convicted of disturbing a religious assembly. On appeal, the defendant argued that the First Amendment protected his conduct. The court rejected that contention, stating: "The First Amendment afford[ed] [the protester] no protection in what he was doing; it afford[ed] members and visitors of the church . . . freedom and security *against* what he was doing. It is not contemplated by freedom of religion that one should be so free in the promulgation of his religious views that he can exercise unlawful force in his efforts to destroy the religious views of another." (*Hill v. State* (Ala.Crim.App. 1979) 381 So.2d 206, 211-212, italics added.)

In another case, the court explained: "The First Baptist Church . . . privately owns a street . . . bordered on both sides by church property. The church retain[ed] control of the privately owned street at all times and reserve[d] the right to close it off to the public at any time. [A protestor] ignored warnings to stay off the church's private property and was arrested for criminal trespass. Based on the line of Supreme Court cases addressing the protection of the first amendment with regard to private property, we hold that [the church-owned street] is not the functional equivalent of a public street or a municipality . . . . Accordingly, [the street] does not fall within the umbrella of first amendment protection . . . . We hold that, under the first amendment, freedom of expression is not protected on a privately owned street . . . ." (*Gibbons v. State* (Tex.App. 1989) 775 S.W.2d 790, 793; accord, *Intern. Society for Krishna Consciousness v. Reber* (C.D.Cal. 1978) 454 F.Supp. 1385.)

In light of Cage-Barile's constant vocal disagreement with the religious beliefs of Church leaders and the congregation, we find guidance in a recent California Supreme Court decision where a nonprofit Catholic hospital terminated the employment of an individual who had been proselytizing among coworkers and patients. The employee sued for wrongful termination in violation of public policy, alleging discrimination based on his religious beliefs.

The high court upheld the hospital's decision, stating: "[W]e address whether terminating an employee of a religiously affiliated health care organization for using *what it considers objectionable religious speech* in the workplace constitutes a form of religious discrimination that violates a fundamental public policy. We conclude that a religious organization may not be held liable under these circumstances. Although there is a clear, constitutionally based state policy against religious discrimination in employment . . . , there is also a *countervailing policy . . . that permits religious organizations to define themselves and their religious message.* We therefore conclude there is no clear public policy against religious organizations *prohibiting what they consider to be inappropriate religious speech* in the workplace . . . ." (*Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1100 [119 Cal.Rptr.2d 698, 45 P.3d 1162], citations omitted, italics added.) Just as a religious hospital may base employment decisions on the religious beliefs and conduct of its employees, a church may consider the same factors regarding its membership.

■ Of course, "[o]wnership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." (*Marsh v. Alabama* (1946) 326 U.S. 501, 506 [66 S.Ct. 276, 278, 90 L.Ed. 265].) ■ But, in this case, the Church is not an open forum. And "[i]f the expression [of speech] is inappropriate for the property or is incompatible with the intended use of the property, then the expression may be totally barred and the property is considered a 'non-forum.' " (*Gannett Satellite Inf. Net. v. Metro Transp. A.* (2d Cir. 1984) 745 F.2d 767, 773.)

Here, "[t]he means of expression [that] [Cage-Barile] insisted on exercising [were] incompatible with the nature of the [Church's services]." (*Crist v. Village of Larchmont* (S.D.N.Y. 1992) 797 F.Supp. 309, 313, affd. mem. (2d Cir. 1993) 9 F.3d 1537.) "[Cage-Barile] . . . possessed the same rights and privileges as the rest of the [congregation] attending [Church services]. However, neither [her] firmness of convictions [nor] the severity of [her] disagreement with the opinions expressed by [Church leaders] . . . elevate [her] rights to attend and speak any higher than the rights of other [Church] members. Affording [Cage-Barile] a right to speak any greater than the rights of others in attendance would [be] totally inappropriate . . . ." (*Crist v. Village of Larchmont, supra,* 797 F.Supp. at p. 313.)

Cage-Barile seems to believe that " 'people who want to . . . protest[] or [express their] views have a constitutional right to do so whenever and

however and wherever they please. That concept of constitutional law [has been] vigorously and forthrightly rejected [by the United States Supreme Court].' " (*Hill v. State, supra,* 381 So.2d at p. 211, italics omitted.) ■ " '[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.' " (*Crist v. Village of Larchmont, supra,* 797 F.Supp. at pp. 313-314.)

■ In sum, the Church leaders and members "were within their rights to [bar] [Cage-Barile] from participating on the terms [she] demanded. [Her] refusal and continued presence on church property could support a valid charge of trespass." (*Crist v. Village of Larchmont, supra,* 797 F.Supp. at p. 314, fn. omitted.) Thus, the Church is likely to prevail on its claim for trespass.

## 2. *Doctrinal Disputes*

■ " 'The relevant inquiry must be whether the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues. . . . [A]s long as the court does not have to resolve the doctrinal propriety [of a church's action] in order to determine who has legal control of the property, there is no unconstitutional intervention by the state in church affairs.'

" '. . . The general rule that courts will not interfere in religious societies with reference to their ecclesiastical practices stems from the separation of the church and state, but has always been qualified by the rule that civil and property rights would be adjudicated.' " (*In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850, 859 [121 Cal.Rptr. 899], italics omitted.)

"Civil courts have general authority to resolve questions regarding the right to possession of church property. . . . 'The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where [such issues] can be determined conclusively.' . . . [¶] . . . [¶]

" ' "[W]hen the dispute to be resolved is essentially ownership or right to possession of property, the civil courts appropriately adjudicate the controversy even though it may arise out of a dispute over doctrine or other ecclesiastical question, provided the court can resolve the property dispute without attempting to resolve the underlying ecclesiastical controversy. . . ." ' " (*Berry v. Society of Saint Pius X* (1999) 69 Cal.App.4th 354, 364-365 [81 Cal.Rptr.2d 574], citations omitted.)

 In denying the Church's application for a restraining order, the trial court cited two cases where competing factions within a congregation each claimed to be the "true" church, *Metropolitan Philip v. Steiger, supra,* 82 Cal.App.4th at page 931, and *Korean Philadelphia Presbyterian Church v. California Presbytery, supra,* 77 Cal.App.4th at pages 1088-1089. Both cases involved disputes that required the interpretation and application of religious doctrine.

The case before us does not raise that problem. There is no doctrinal issue to be decided. Cage-Barile has not challenged the Church's decision to terminate her membership. Her expulsion is therefore a given. The Church does not want her on its property, and Church leaders have told her so. Yet, she keeps returning.

Simply put, Cage-Barile is a trespasser. The pertinent question, then, is whether a church or religious organization can exclude unwelcome persons from its premises. The answer is yes. (See *Naumann v. Zimmer* (Minn.Ct.App., Feb. 3, 1998, No. C-7-97-1414) 1998 WL 40570; *Gibbons v. State, supra,* 775 S.W.2d 790; *Hill v. State, supra,* 381 So.2d 206; *State v. Steinmann* (1990) 20 Conn.App. 599 [569 A.2d 557]; *Collins v. Freeland* (1971) 12 N.C.App. 560 [183 S.E.2d 831].)

B. *Interim Harm*

 In evaluating interim harm, the trial court compares the injury to the plaintiff in the absence of a restraining order to the injury the defendant is likely to suffer if an order is issued. (*IT Corp., supra,* 35 Cal.3d at pp. 69-70.) " ' "[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or . . . should not be restrained from exercising the right claimed by him." ' " (*Id.* at p. 70.)

 Here, in the absence of a restraining order, the Church and the congregation would continue to suffer from Cage-Barile's outbursts and disruptive behavior. This is not a dispute over free speech. The Church has expelled a member who was harassing the congregation and disrupting religious services. With each passing day, the Church risks losing more members. And the Church should not have to conduct services or meetings in secret just to avoid the interference of an expelled congregant. Without a restraining order, the Church and its members would suffer irreparable harm.

If a restraining order is granted, the affect on Cage-Barile would be negligible. She would no longer be able to annoy the congregation, tear

down Church bulletins, or frighten children. She has said that she will continue her disruptive behavior until a court directs otherwise. That time has come.

In closing, we conclude that the Church has made a strong showing on the merits of its claim, and, absent prompt injunctive relief, Church members and leaders will suffer irreparably. The trial court erred in denying the Church's application for a temporary restraining order and an order to show cause.

## III

### DISPOSITION

Let a peremptory writ of mandate issue, commanding respondent court to (1) vacate its decision denying petitioners' application for a temporary restraining order and an order to show cause and (2) enter a new order granting the requested relief. Petitioners are entitled to costs in connection with this proceeding.

Spencer, P. J., and Ortega, J., concurred.