**Jack OLIVER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A05–0203–CR–111.**

Court of Appeals of Indiana.

June 12, 2003.

Dale W. Arnett, Winchester, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant Jack Oliver (Oliver) appeals his conviction for disorderly conduct, a Class B misdemeanor, pursuant to Ind. Code § 35–45–1–3.

We reverse.

### ISSUE

Oliver raises several issues for appeal, one of which we find dispositive: whether the evidence was sufficient to support his conviction for disorderly conduct, a Class B misdemeanor.

### FACTS AND PROCEDURAL HISTORY

On August 11, 2001, Oliver participated along with others from the Old Paths Baptist Church (Old Paths) in a demonstration against the Evangelical Lutheran Church of America's policy regarding the ordination of homosexuals. The Old Paths' demonstration was concentrated near the intersection of Maryland Street (Maryland) and Capitol Avenue (Capitol) in downtown Indianapolis. At the same time, an estimated 40,000 to 50,000 football fans were converging on the RCA Dome located a couple of blocks south at the intersection of Georgia Street (Georgia) and Capitol for an Indianapolis Colts exhibition game.

Indianapolis Police Department Captain Peter Bolles (Captain Bolles) was in charge of traffic detail on the day in question and was located at Georgia and Capitol. At trial, Captain Bolles testified that, shortly after 4:00 p.m., he received a report that demonstrators were disrupting the flow of both pedestrian and vehicular traffic at the intersection of Maryland and Capitol and "creating a public safety issue." (Transcript p. 22). As a result, Captain Bolles paged his supervisor, Deputy Chief Bettye Dobkins (Deputy Chief Dobkins), requesting that Deputy Chief Dobkins and extra officers report to Maryland and Capitol.

Deputy Chief Dobkins, who was off-duty at home when she was paged, arrived at the intersection of Maryland and Capitol at approximately 5:00 p.m. When she arrived, Deputy Chief Dobkins observed heavy pedestrian and vehicular traffic traveling to the RCA Dome. Deputy Chief Dobkins also saw demonstrators, including Oliver, with signs. Most of the demonstrators were standing against a brick wall out of pedestrian traffic. However, Oliver

was standing in the middle of the sidewalk on the northwest corner of Maryland and Capitol. Deputy Chief Dobkins testified that the sign Oliver was carrying measured approximately two feet by three feet, and that Oliver was turning the sign as he moved on the sidewalk. Deputy Chief Dobkins observed that other pedestrians had to walk into the street to avoid running into Oliver or being hit by his sign, which, in combination with the heavy vehicular traffic, created a hazard to the pedestrians. As a result, Deputy Chief Dobkins arrested Oliver for blocking the sidewalk. Oliver was charged with disorderly conduct, a Class B misdemeanor.

On January 9, 2002, a jury trial was held. The jury found Oliver guilty of disorderly conduct, a Class B misdemeanor. That same day, the trial court sentenced Oliver to ten days in the Marion County Jail with zero days credit for time served, suspended the ten-day jail sentence and ordered no probation. Oliver was also ordered to pay $270.00 in fines, court costs and fees within ninety days.

Oliver now appeals. Additional facts will be supplied as necessary.

### DISCUSSION AND DECISION

Oliver was convicted of disorderly conduct on the State's theory that the Colts football game was a "lawful assembly of persons," and that the pedestrian traffic, which was in the process of assembling for the football game, was also a part of that lawful assembly of persons. The State argued that, in disrupting the flow of pedestrian traffic to the Colts game, Oliver was disrupting a lawful assembly of persons in violation of I.C. § 35–45–3–1(3). Oliver admits that most of the pedestrians were probably walking towards the RCA Dome, where they would *become* a lawful assembly of persons. However, Oliver asserts that the people moving on the sidewalks were not a "lawful assembly of persons," pursuant to I.C. 35–45–2–1(3), *while* they were walking to the RCA Dome; they were merely pedestrian traffic. Consequently, Oliver argues that his conviction for disorderly conduct based on disrupting a lawful assembly of persons cannot stand.

■ With regard to the disorderly conduct statute, this court has previously defined "assembly" as "an assembled group, especially of people meeting for a specific purpose." *D.R. v. State*, 729 N.E.2d 597, 599 (Ind.Ct.App.2000). Given the plain meaning of this definition, we find that "assembly" refers to a group that is already assembled, as opposed to one that is in the process of assembling. *See id.* Accordingly, we decline to extend the meaning of a "lawful assembly of persons" to pedestrian and vehicular traffic, the majority of which is moving towards a place to assemble, such as the Colts fans moving towards the RCA Dome to see the Colts football game.

Next, Oliver argues that the evidence presented at trial was insufficient to support the jury's finding that he committed disorderly conduct by disrupting a lawful assembly of persons. In reviewing sufficiency of the evidence claims, this court does not reweigh the evidence or assess the credibility of witnesses. *Cox v. State*, 774 N.E.2d 1025, 1028–29 (Ind.Ct.App. 2002). We consider only the evidence most favorable to the judgment, together with all reasonable and logical inferences to be drawn therefrom. *Alspach v. State*, 755 N.E.2d 209, 210 (Ind.Ct.App.2001), *trans. denied.* The conviction will be affirmed if there is substantial evidence of probative value to support the conclusion of the trier-of-fact. *Cox*, 774 N.E.2d at 1028–29.

Indiana Code § 35–45–1–3 provides, in pertinent part, that "[a] person who reck-

lessly, knowingly, or intentionally disrupts a lawful assembly of persons commits disorderly conduct, a Class B misdemeanor." In light of his argument in the section above, Oliver contends that the facts of his case do not fit the elements of the crime, as charged. Specifically, Oliver argues that when he was arrested, he was told that he was arrested for obstructing pedestrian traffic. Oliver notes that obstruction of traffic is a specific charge apart from disorderly conduct, and that he was therefore improperly charged and convicted of disorderly conduct. We agree.

Until July 1, 1988, I.C. § 35–45–1–3 included separate provisions as follows:

A person who recklessly, knowingly or intentionally:

. . . .

(3) disrupts a lawful assembly of persons; *or*

(4) obstructs vehicular or pedestrian traffic;

commits disorderly conduct, a Class B misdemeanor.

I.C. 35–45–1–3 (1986) (emphasis added). However, in 1988, Public Law 92–1988 deleted subsection (4) and created a new offense of obstruction of traffic, a Class B misdemeanor. The resultant statute provides that "[a] person who recklessly, knowingly or intentionally obstructs vehicular or pedestrian traffic commits obstruction of traffic, a Class B misdemeanor." I.C. § 35–42–2–4. Thus, the issue we must determine is whether a person can be properly charged with and convicted of disorderly conduct for obstructing pedestrian traffic.

When construing a statute, our objective is to determine and effect the true intent of the legislature. *State v. Hensley,* 661 N.E.2d 1246, 1248 (Ind.Ct.App.1996). The legislature is presumed to have existing statutes in mind when it adopts a new law. *Morgan County R.E.M.C. v. Indianapolis Power & Light Co.,* 260 Ind. 164, 302 N.E.2d 776, 778 (1973), *McClarnon et al. v. Stage,* 215 Ind. 157, 163, 19 N.E.2d 252, 254 (Ind.1939). Clearly, the legislature was mindful of the disorderly conduct statute when it created the obstruction of traffic statute in 1988, as the latter statute is comprised of language purposefully severed from the former statute. Thus, because it was the obvious intent of the legislature to make obstruction of traffic a separate crime from disorderly conduct, we can safely conclude that the act of obstructing pedestrian traffic no longer constitutes disorderly conduct.

■ Here, the record reveals that testimony from the State's three witnesses as well as the probable cause affidavit indicate that Oliver was arrested because he was obstructing pedestrian traffic. Captain Bolles testified that he paged Deputy Chief Dobkins for backup because demonstrators were "disrupting the flow of pedestrian traffic and vehicular traffic and creating a public safety issue." (Tr. p. 22). When Deputy Chief Dobkins arrived, she saw Oliver standing in the middle of the sidewalk, holding a large sign, on the northwest corner of Maryland and Capitol. Deputy Chief Dobkins testified that:

I arrested him for blocking the sidewalk, creating a disturbance. People were forced to walk into the street or walk around him to avoid running into him or being hit by his sign as he was turning and talking.

(Tr. pp. 29–30). Deputy Chief Dobkins further testified that none of the other demonstrators were arrested because "[n]o one else was blocking the sidewalk." (Tr. p. 30). Additionally, Indianapolis Police Department Sergeant Terry Hall testified that:

I saw Mr. Oliver had walked away from the group and walked towards the corner by a handicapped ramp there on the corner of Maryland and Capitol and was holding up a sign and talking to people as they were coming by. People were having to walk around him....They would step off the curb and walk around him or try to get on the inside.

(Tr. p. 44). Finally, in its probable cause affidavit, the State alleged as follows:

On August 11, 2001, at approx. 5:40 P.M., Jack Oliver, white male 27, DOB 3–10–74, was blocking the sidewalk at Capitol and Maryland Streets. Oliver, a member of John Lewis' Old Paths Baptist Church group[,] had been told with everyone else and by John Lewis that he could not stand with his three foot by three foot protest sign blocking the sidewalk. Due to the Colts game, there were thousands of people traversing the sidewalk. Oliver was standing in the middle of the sidewalk, causing people to have to walk around him in order to get down the sidewalk. His sign created a hazard in that he was swinging it around and yelling.

(Appellant's App. p. 13).

In the instant case, the evidence presented overwhelmingly demonstrates that Oliver was arrested because he was obstructing pedestrian traffic on the corner of Maryland and Capitol. Although this evidence would have been sufficient to support a conviction for obstructing traffic, we find that the evidence simply does not support Oliver's conviction for disorderly conduct as charged. Accordingly, we must reverse Oliver's conviction for disorderly conduct, a Class B misdemeanor.

### CONCLUSION

For the foregoing reasons, we reverse the conviction of Oliver for disorderly conduct, a Class B misdemeanor.

Reversed.

BARNES, J., concurs.

SHARPNACK, J., dissents with separate opinion.

SHARPNACK, J. dissenting.

I respectfully dissent because I conclude that the majority has construed the term "assembly" too narrowly and the evidence is sufficient to sustain Oliver's conviction for disorderly conduct as a class B misdemeanor.

Oliver was convicted of disorderly conduct pursuant to Ind.Code § 35–45–1–3(3) (1998), which provides that: "A person who recklessly, knowingly, or intentionally ... disrupts a lawful assembly of persons commits disorderly conduct, a Class B misdemeanor." As we noted in *D.R. v. State*, the phrase "a lawful assembly of persons" has not been defined by the legislature. 729 N.E.2d 597, 599 (Ind.Ct.App.2000). Thus, in accordance with our rules of statutory interpretation, we must look to the plain language of the statute and attribute the common, ordinary meaning to terms found in everyday speech. *Id.* In determining the plain and ordinary meaning of a term, we may use English language dictionaries as well as consider the relationship with other words and phrases. *Id.*

In *D.R.*, we dealt with what was clearly not an assembly one person. *Id.* We did not have before us whether the disruption of the passage of a large number of pedestrians en route to, and little more than a block away from, the site of a professional sports game would constitute an "assembly." The dictionary definition of "assembly" also encompasses the process of assembling. For example, the Webster's New World Dictionary defines "assembly," in part, as "an assembling or being assembled." WEBSTER'S NEW WORLD DICTIONARY

82 (3rd ed.1988). *See also Hill v. State,* 381 So.2d 206, 212 (Ala.Cr.App.1979) (holding that in the statute governing the offense of disturbing religious worship, the phrase "any assemblage of people" includes a period of time before the services commence and a reasonable time after the services terminate), *writ denied by Ex parte Hill,* 381 So.2d 213 (Ala. Mar.28, 1980); 27 C.J.S. *Disturbance of Public Meetings* § 3(c)(3) (1999); 24 Am.Jur. 2d *Disturbing Meetings* § 7 (1998). Consequently, the majority opinion takes much too narrow a view of "lawful assembly."

As for the sufficiency of the evidence, it is clear from the record that a great part, if not all, of the pedestrian traffic was en route to the RCA Dome to attend the Indianapolis Colts football game. Thus, although it is not without dispute, there is evidence in the record to support the conclusion that Oliver "recklessly, knowingly, or intentionally" disrupted the flow of persons assembling for the Colts game. As a result, the evidence is sufficient to sustain Oliver's conviction for disorderly conduct, a Class B misdemeanor. Accordingly, I would affirm on this issue and address the remaining issues raised by Oliver.