Filed 5/17/23  eGumball v. Merrick Bank Corp. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| EGUMBALL, INC., | |
| Plaintiff and Respondent, | G060853 |
| v. | (Super. Ct. No. 30-2021-01216871) |
| MERRICK BANK CORPORATION, et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, James L. Crandall, Judge.  Reversed.

Duane Morris, Paul J. Killion, C. Todd Norris, Michelle N. Khoury, Daniel G. Gurfein and James J. Regan for Defendant and Appellant Merrick Bank Corporation.

Roxborough, Pomerance, Nye & Adreani and Gary A. Nye for Defendant and Appellant Paysafe Payment Processing Solutions, LLC.

Gibson, Dunn & Crutcher, Timothy W. Loose and Blaine H. Evanson for Defendant and Appellant Visa, Inc.

The Samini Firm, Bobby Samini, Michael J. Buley, and Michael S. Yasin; Greines, Martin, Stein & Richland, Alana Rotter and Nadia A. Sarkis for Plaintiff and Respondent eGumball, Inc.

*      *      *

This is an appeal from a temporary restraining order (TRO) directed to Merrick Bank Corporation (Merrick), Paysafe Payment Processing Solutions, LLC (Paysafe), and Visa, Inc. (Visa) (collectively appellants). The trial court issued the TRO after appellants placed eGumball on the "Mastercard Alert to Control High-Risk Merchants" system (the MATCH list).[1] The MATCH list is a database of high-risk merchants maintained by Mastercard. Financial institutions that provide credit card processing services use the MATCH list to screen merchants before entering into agreements with them, to determine their risk as a merchant account holder.

Merrick placed eGumball on the MATCH list based on an investigation run by Visa. Visa used two test credit cards when investigating two online pharmacies, which were illegally selling opioids. eGumball, which is in the business of search engine optimization, submitted transactions involving those cards to its bank Merrick. After it did so, Merrick terminated eGumball's merchant account and added eGumball to the MATCH list. eGumball admits it ran the cards but explains it did so in an attempted business relationship with one of the pharmacies. The pharmacy gave eGumball the credit card numbers to pay for eGumball's search engine optimization services. eGumball claimed it did not know the credit cards did not belong to the pharmacy or that the credit cards were part of Visa's sting operation. It presented this information to appellants, but Merrick did not remove eGumball from the MATCH list.

eGumball filed an action against appellants in the superior court. Several weeks later, eGumball filed an ex parte application for a TRO. Following a noticed

---

[1] In the record, MATCH is sometimes referred to as Mastercard's "Member Alert to Control High-Risk Merchants."

2

hearing, the court granted the TRO and issued an order to appellants to show cause why a preliminary injunction should not issue. The TRO directs appellants to request that Mastercard remove eGumball from the MATCH list and enjoins appellants from placing eGumball back on the MATCH list based on the same incident.

Appellants contend the court abused its discretion by issuing the TRO. We conclude the provision in the TRO directing appellants to request eGumball's removal from the MATCH list is a mandatory injunction, subject to heightened scrutiny on appeal. The purpose of a properly issued TRO is to preserve the status quo pending a preliminary injunction hearing. The evidence in this record is insufficient to support the issuance of the TRO. eGumball did not show it would suffer great or irreparable injury before a hearing on the preliminary injunction could be held. Thus, we conclude the court abused its discretion by issuing the TRO. The trial court properly issued an order to show cause, and we note a preliminary injunction hearing is pending in the trial court.[2]

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE PARTIES

eGumball is in the search engine optimization industry; it helps other "businesses acquire customers by optimizing their online presence." Prior to being placed on the MATCH list, eGumball employed about 450 people, had thousands of business clients, and its market valuation was $80 million. eGumball's clients paid almost exclusively with credit cards, typically set up for monthly recurring charges pursuant to written agreements.

---

[2] We express no view on how the court should resolve any of the issues before it at the preliminary injunction hearing. Our opinion is based on the evidence before the trial court at the time it issued its decision, and the parties may present different evidence at the preliminary injunction hearing.

3

To process these credit card transactions, merchants like eGumball usually contract with an independent sales organization (ISO) and a bank that is a member of a credit card network. The bank and ISO process the merchant's credit card transactions, settle them with the credit card companies, and deposit funds into the merchant's business banking account.

In 2014, eGumball was looking for a new bank to process its clients' credit card payments. MeritCard Solutions, an ISO and predecessor of Paysafe, assisted eGumball with its application to Merrick. eGumball's owner and principal, John Bauer, signed and submitted to Merrick a "Merchant Application and Agreement." The Merchant Application and Agreement lists "Important Merchant Responsibilities:" including "Reviewing and understanding the Merchant Agreement" and "Complying with Visa's operating regulations." Just above Bauer's signature, the Merchant Application and Agreement states: "By executing this Merchant Application on behalf of the merchants described above ('Merchant'), the undersigned individual(s) represent(s), warrant(s), and acknowledge(s) that: . . . (vii) The undersigned has received, read, understood, the Merchant Agreement, which is incorporated herein by reference thereto, and agrees on behalf of the merchant to be bound by the terms of such Merchant Agreement." Bauer avers, however, eGumball never received a copy of Merrick's Merchant Agreement and never agreed to its terms.

A few weeks after eGumball submitted its application, MeritCard informed eGumball the application had been approved and eGumball was issued a merchant identification number (MID). The approval letter advised eGumball: "The card associations require merchants comply with all current rules and regulations regarding card acceptance practices. For additional information regarding the terms of your agreement please refer to your Program Guide." An Internet address was provided for eGumball to use to access the Program Guide. The approval letter also listed "Prohibited Transactions," which included, among others: (1) "Attempting multiple authorizations

4

on a previously declined sale"; (2) "Accepting transactions where cardholder is not the same as person presenting card. This includes acceptance of any card where signature on back of card does not match transaction receipt"; and (3) "Factoring (Draft Laundering) as defined as the process where merchant deposits drafts (sales) on behalf of another business (merchant)." eGumball was instructed to contact the "Merchantcard Risk and Suspicious Transaction Support" (boldface and capitalization omitted) anytime it was presented with a suspicious card, prior to accepting the sale or order.

Thereafter, Merrick was eGumball's bank. Paysafe acquired MeritCard around 2016 and became the ISO. According to eGumball, each of its credit card transactions initially goes through Paysafe for processing to verify and secure the transaction information before the transaction goes to Merrick, which sends it to Visa.

II.

VISA'S INVESTIGATION

Visa maintains a Global Brand Protection Program (GBPP) that "endeavors to protect the Visa payment system from transactions that are illegal or otherwise damaging to Visa's brand." As part of this effort, Visa's GBPP team attempts to identify merchants that try to submit prohibited transactions into the Visa payment system.

In May 2021, Visa's GBPP team learned prescription-strength opioids were unlawfully being sold without a prescription and could be purchased with a credit card from two Internet-based pharmacies. We will refer to these two online pharmacies as SMS and GSP.

Seeking to investigate these two pharmacies, the GBPP team created two test credit cards to use in transactions with them, so Visa could track all activity on these cards after they had been given to pharmacies. A GBPP team member used one of the credit cards to purchase Norco pills from GSP; the other card was used to purchase Oxycodone from SMS. Both sales were unlawful as they were made without requiring a valid prescription.

5

The GBPP team monitored the test credit cards' accounts and waited to see how these cards' numbers were used after they were provided to the online pharmacies. Visa's GBPP team did not expect to see charges from GSP or SMS on the test cards' accounts because usually websites engaged in illicit activity do not have credit card processing services.

In May 2021, the GBPP team saw the card numbers for both test cards were submitted into the Visa payment system by eGumball, meaning eGumball tried to run both test cards for payment. Visa, however, had intentionally set the cards to decline any authorization attempts because Visa did not want to illegally obtain opioids and did not want to transfer money to anyone involved in such transactions.

A few days later, a GBPP investigator e-mailed GSP, using the alias the investigator had used in the opioid purchase. The GBPP investigator inquired about the opioid order and charge, asking if the charges "SEACH ENGINE LISTING and EGUMBALL INC" were from GSP. An individual responding on behalf of the pharmacy responded: "They are both from me." Based on the GBPP team's investigation, Visa concluded there was a potential connection between the two pharmacy websites and eGumball.

On May 25, 2021, Visa sent Merrick two letters concerning the two pharmacy transactions and eGumball. In the letters, Visa informed Merrick its GBPP team had identified eGumball as processing illegal and/or brand damaging transactions involving the sale of controlled substances without a prescription. Visa gave Merrick five business days to investigate the matter and provide a written response addressing how the violations would be remediated and documentation "demonstrating merchant compliance with the *Visa Rules* requirement that prohibits illegal transactions from entering the payment system." Visa also advised Merrick if the results of Merrick's investigation conflicted with Visa's findings, Merrick should immediately contact Visa before contacting eGumball. The letters further stated Merrick might be subject to a

6

$25,000 fine for each violation and escalating fines might be levied if eGumball remained "non-compliant."

Merrick did not uncover any evidence to contradict Visa's finding eGumball processed transactions on the test cards that were used for the purchases at the two online pharmacies. Merrick's risk monitoring vendor ran test transactions through the two pharmacies' websites and the transactions did not run through eGumball's MID. But Merrick did not consider this to be evidence contradicting Visa's findings.

III.

TERMINATION OF EGUMBALL'S MERCHANT ACCOUNT

On June 1, 2021, Paysafe informed eGumball its account had been placed on hold because the company had reason to believe, based on information from Visa, sales generated from SMS and GSP were processed through eGumball's MID. Paysafe requested eGumball provide information regarding its connection to the two pharmacy websites. eGumball denied any connection to the two pharmacies and asked for additional details to investigate the matter. Paysafe responded it did not have details and the information it had received came from Visa. Paysafe informed eGumball Visa stated it had "positively confirmed" transactions processed on eGumball's MID were connected to the two pharmacy websites. Paysafe told eGumball Visa would not provide additional information on how the transaction was traced but Visa had "confirmed" there was "transaction laundering" on eGumball's MID.

eGumball repeatedly denied any connection to the two pharmacy websites and sought to clear up what it believed was an error. eGumball explained it does not process any credit cards through its public website. Its clients provide credit card numbers in their contracts to pay for eGumball's services. eGumball audited its accounts. It reported to Paysafe all of its charges were legitimate as it was able to reconcile the charges with its clients' contracts. eGumball offered to provide copies of its

7

clients' contracts and its audit results so Paysafe and Visa could validate eGumball's findings.

eGumball investigated the two pharmacy websites and informed Paysafe the websites had foreign hosting and were possibly related to each other by hosting, ownership, or development agreements. eGumball could not find any backlinks for these domains that were tied to its business. It maintained Visa had the wrong merchant as it believed it had not been involved with these pharmacies.

IV.

EGUMBALL IS PLACED ON THE MATCH LIST

On June 4, 2021, Merrick and Paysafe terminated their Merchant Agreement with eGumball. Because of this, eGumball was unable to receive its clients' credit card payments, which were its main source of revenue. Merrick informed Visa it had terminated its relationship with eGumball. The same day, Merrick reported eGumball to the MATCH list.

MATCH "is a compliance program operated by Mastercard, which allows financial institutions that acquire and/or process payment card transactions for merchants ('acquirers') to review certain merchant risk information before entering into an agreement with a new merchant." The MATCH list is a database with information about merchants who have been terminated by participating financial institutions. When an acquirer considers entering into a new agreement with a merchant, it can use the MATCH list to determine if another acquirer has previously terminated the merchant "due to circumstances that could affect the decision whether to" work with the merchant and "whether to implement specific action or conditions . . . ." (<https://www.mastercard.us/ content /dam/mccom/en-us/documents/rules/SPME-Manual-February-2019.pdf> (Mastercard Rules) ch. 11, p. 111 [as of May 15, 2023], archived at: <http://perma.cc/PQJ2-7SKR>.) "MATCH is a mandatory system for Mastercard Acquirers unless excused by Mastercard or prohibited by law." (*Ibid*.)

8

Pursuant to the Mastercard Rules, if an acquirer like Merrick terminates its relationship with a merchant and at the time of termination "has reason to believe that a condition described in Table 11.4 exists, then the Acquirer must add the required information to MATCH within five calendar days of" the decision to terminate the merchant relationship. (Mastercard Rules, ch. 11.2.2, p. 115.) The Mastercard Rules further state, "Acquirers must act diligently, reasonably, and in good faith to comply with MATCH system requirements." (*Ibid*.) "An Acquirer that fails to enter a Merchant into MATCH is subject to a noncompliance assessment, and may be subject to an unfavorable ruling in a compliance case filed by a subsequent Acquirer of that Merchant." (*Ibid.*) The Mastercard Rules also address removal of a merchant from the MATCH list, stating Mastercard may remove a merchant listing from MATCH if the acquirer reports to Mastercard it added the merchant "in error." (*Id.*, ch. 11.4, p. 116.)[3]

Here, Merrick determined, under the Mastercard Rules Table 11.4, the applicable code was "03 Laundering." In this context, laundering has a specific definition. The Mastercard Rules define it as "The Merchant was engaged in laundering activity. Laundering means that a merchant presented to its Acquirer Transaction records that were not valid Transactions for sales of goods or services between that Merchant and a bona fide Cardholder." (Mastercard Rules, ch. 11, p. 118.) Merrick concluded the illegal and/or brand damaging transactions identified by Visa met this definition, and Merrick used this code for eGumball's MATCH listing.

After being placed on the MATCH list, eGumball was unable to find a credit card processing bank (acquirer) that would work with it. eGumball was told no

---

[3] Visa has its own rules relating to the MATCH list. Visa's rules require an acquirer to add a merchant to the MATCH list promptly upon terminating an account. Visa's rules also state "only the Member that added the Merchant to the Terminated Merchant File may request deletion of the Merchant name or information." (See Visa Core Rules and Visa Product and Service Rules (Apr. 17, 2021) at p. 644, <https://www.tinyurl.com/vrt6pa9s> [as of May 15, 2023], archived at: <http://perma.cc/HV8X-M8C4>.)

bank would consider it because of the laundering label on the MATCH list and it would have to get "a MATCH list removal letter from" appellants before it could open a new account.

eGumball e-mailed its clients and informed them it no longer accepted credit card payments. Thousands of eGumball's clients cancelled their accounts and several of eGumball's key employees resigned.

V.

EGUMBALL'S CONTINUED INVESTIGATION UNCOVERS TRANSACTION WITH SMS

On July 1, 2021, eGumball informed Paysafe it had discovered SMS was a business that signed up for eGumball's services on May 4, 2021, and eGumball had attempted to process two credit cards provided by SMS for $308. eGumball twice attempted to process one credit card, but the card was denied both times. SMS provided another credit card, which eGumball also ran, and it, too, was denied. eGumball believed these credit card transactions were the ones flagged by Visa. After both cards were declined, eGumball ceased contact with SMS.

eGumball also explained how it came into contact with SMS. In April 2021, a company that provides eGumball with monthly sales leads listed SMS as a potential customer. eGumball's call center contacted SMS on May 4, 2021, to solicit its business. eGumball accepted SMS's application/contract for its optimization services. This document states eGumball's monthly service includes keyword research and analysis and "Optimized Listings in Google My Business & Bing Places." SMS's keyword statements listed on the document include "pain relief medication," "Oxycontin/Roxicodone/Dilaudid," and "Xanax/Percocet Adderall." After eGumball attempted to process SMS's credit card information and the transactions were declined, eGumball cancelled the contract and the sale never reached eGumball's "quality control systems."

10

eGumball asserted this information showed it was not involved in any fraud and the transactions occurred during the processing of a sale with what it "believed was a legitimate pharmacy." Appellants, however, refused to remove eGumball from the MATCH list.

## VI.

### EGUMBALL SUES MERRICK, PAYSAFE, AND VISA

In August 2021, eGumball filed a complaint alleging six causes of action against Merrick, Paysafe, and Visa: (1) trade libel; (2) defamation; (3) conversion; (4) unfair business practices; (5) intentional inference with prospective economic advantage; and (6) negligent interference with prospective economic advantage. In the complaint, eGumball alleged appellants falsely published a statement on the MATCH list that eGumball was a launderer, knowing the statement was false.

## VII.

### EGUMBALL'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

More than a month after filing its complaint, eGumball filed an ex parte application for a TRO and an order to show cause (OSC). eGumball sought an order compelling appellants to act to remove eGumball from the MATCH list and to restrain them from placing eGumball back on the MATCH list pending a hearing on a preliminary injunction. The TRO application included a declaration by Bauer, eGumball's owner. Bauer declared eGumball had been unable to find a bank to process its credit card payments because of the MATCH listing, and as a result, eGumball's revenue had come "to an abrupt and almost complete halt." eGumball argued absent a restraining order, it would "suffer great and immediate irreparable harm in that its business will continue to be harmed by its revenue being restrained to the point that it will ultimately be unable to continue to exist." eGumball asserted its business "may never recover and it may cease to exist entirely if a TRO is not issued ordering [its] removal from the MATCH list." eGumball contended there was a reasonable probability

11

it would prevail on the merits of its underlying claims. A hearing on the TRO application was set for the following day.

All three appellants opposed eGumball's ex parte TRO application. Visa argued the court should deny the TRO application because: (1) eGumball failed to show an urgent need for emergency relief; (2) eGumball was not entitled to injunctive relief as it was unlikely to succeed on the merits and failed to establish immediate or irreparable harm; and (3) the relief eGumball requested was "improper because it upsets the status quo, compels Visa to speak, and is impossible to administer." Visa asserted the TRO was improper because the court could not require Visa to take the steps necessary to remove eGumball from a list maintained by nonparty Mastercard. Visa attached a declaration by a director of GBPP, who stated the GBPP team had not received any information from eGumball demonstrating eGumball's two transaction records affiliated with the opioid purchase were created in error.

Merrick relied heavily on its Merchant Agreement in arguing the TRO application should be denied. Pursuant to Merrick's Merchant Agreement, eGumball had agreed to Utah as the exclusive jurisdiction for any action against Merrick, and Merrick intended to seek dismissal of the complaint filed in California on this ground and others. The Merchant Agreement also stated the merchant (eGumball) "expressly agrees and consents to [MATCH] reporting if Merchant is terminated for any reason requiring listing on the MATCH file. Merchant waives and will hold harmless Bank [Merrick] from any claims that Merchant may raise as a result of Bank's MATCH file reporting.'" (Boldface omitted.) Merrick asserted under the Merchant Agreement, it properly terminated eGumball, was required to identify it as a terminated merchant on MATCH, and eGumball could not bring claims against Merrick based on Merrick's MATCH reporting. Merrick further asserted the TRO eGumball was requesting would restrain Merrick's speech by requiring Merrick to retract eGumball's MATCH listing. Paysafe joined in the oppositions filed by Visa and Merrick.

12

Appellants appeared at the hearing on eGumball's ex parte TRO application. The court continued the hearing until October 21, 2021 and provided the parties an opportunity to submit additional briefing. Each party filed additional briefing, reiterating and supplementing their prior arguments.

In its supplemental brief, eGumball stated it had lost one-half of its revenue because of appellants' conduct. It asserted an injunction was needed to save the company "and allow it to survive long enough for the trier of fact to determine the appropriate remedies to right [appellants'] wrongs and allow eGumball to begin to rebuild its reputation and business." Visa maintained eGumball attempted to initiate transactions with credit cards used to purchase illegal prescription drugs and Visa acted reasonably in alerting Merrick to potential misconduct linked to eGumball's account. Merrick contended eGumball was correctly placed on the MATCH list for the reason listed, asserting eGumball's evidence confirmed it sought to complete transactions with the online pharmacy website that were not valid transactions with a bona fide cardholder, an action that meets MATCH's laundering definition. Merrick argued, "the standard for listing a merchant on MATCH for transaction laundering doesn't require proof of knowing participation in fraud."

## VIII.

### HEARING ON THE APPLICATION AND ISSUANCE OF THE TRO

A hearing on the TRO was held in October 2021. Visa, Merrick, and Paysafe argued against issuance of a TRO. Merrick argued eGumball's transactions met the definition of laundering, and therefore, it had an obligation to report it had terminated eGumball for this type of transaction. The court stated it thought "maybe a temporary restraining order is the fairer thing to do and we will get all the evidence out at the preliminary injunction hearing," which the court expected would be held soon. Indicating it would issue a TRO, the court explained, "there is not a basis here to put this company out of business and put them on the M[ATCH] system that is going to prevent

13

other people from doing business with them." The court stated it had to grant the TRO "as a matter of basic fairness."

When asked for clarification, the court indicated it was finding the statement Merrick made in putting eGumball on the MATCH list was "not false, [but] simply inaccurate." The court stated it was not finding defamation or an intent to make a false statement at that time and the parties could present further evidence and argument at the preliminary injunction hearing. The court remarked, "there may be a likelihood of success as to the defamation," but "[the court needed] further evidence as to the basis for that inaccuracy." The court stated it was "appropriate to have [eGumball] removed from" the MATCH list at the time, but if it did not grant the preliminary injunction, appellants could put eGumball back on the list. The court did not require a bond, stating it would take care of that at the preliminary injunction stage, if it granted a preliminary injunction.

On November 3, 2021, the court issued the TRO addressed to Merrick, Paysafe, and Visa. It states:

"You, your agents, assigns, employees, partners and all those acting in concert with you, are hereby ordered to request Mastercard to have eGumball, Inc.'s Member Alert to Control High-Risk Merchants List (aka 'MATCH' list) designation reversed and to request Mastercard remove eGumball, Inc. from the MATCH list.

"Upon eGumball, Inc.'s removal from the MATCH list, you, your agents, assigns, employees, partners and all those acting in concert with you, are hereby restrained and enjoined from placing eGumball, Inc. back on the MATCH list on the basis of events underlying or related to its placement on the MATCH list on June 4, 2021.

"This Temporary Restraining Order is effective this date, is without prejudice to Defendant[s'] position that its actions were not in error, and shall remain in full force and effect unless and until further ordered by the Court." (Boldface & some capitalization omitted.)

14

The court also issued an order for appellants to show cause on November 22, 2021, why a preliminary injunction should not issue restraining them from placing eGumball back on the MATCH list for the remainder of the litigation.

## IX.

### APPEAL FROM THE TRO

Appellants appealed from the trial court's issuance of the TRO and asserted the TRO was automatically stayed pending their appeal. (See Code Civ. Proc, § 916, subd. (a); *Daly v. San Bernardino County Bd. of Supervisors* (2021) 11 Cal.5th 1030 (*Daly*) [mandatory injunction automatically stayed pending appeal].)

## DISCUSSION

### I.

### APPEALABILITY OF A TRO

We invited the parties to brief the appealability of the court's issuance of a TRO. Only appellants accepted our invitation.[4] We agree with appellants a TRO is appealable under Code of Civil Procedure section 904.1, subdivision (a)(6).[5] (*Bustos v. Wells Fargo Bank, N.A.* (2019) 39 Cal.App.5th 369, 375 ["A TRO, as an interim provisional order granting injunctive relief, is immediately appealable"]; *McLellan v. McLellan* (1972) 23 Cal.App.3d 343, 357 ["A temporary restraining order is separately appealable"].) Nearly a century ago, when discussing former Code of Civil Procedure section 963, the predecessor to section 904.1, the Court of Appeal stated: "It is clear that

---

[4] eGumball declined our invitation. It sought, instead, to stay the appeal pending a ruling by the trial court on its request for a preliminary injunction. eGumball expressed its "desire" was "to have the TRO vacated and this appeal dismissed as moot."

[5] Code of Civil Procedure section 904.1, subdivision (a)(6), states an appeal may be taken "[f]rom an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction."

15

the intent of the statute is that all orders granting or refusing injunctions, whether temporary or permanent or provisional pending appeal, shall be appealable . . . ." (*Brydon v. Hermosa Beach* (1928) 93 Cal.App. 615, 620.)  This intent remains clear in section 904.1, subdivision (a)(6).

Typically, TROs are of a short or limited duration as a preliminary injunction hearing follows quickly thereafter, at which time the TRO is automatically dissolved or terminated when the court grants or denies a preliminary injunction.  (Code Civ. Proc, § 527.)  When a preliminary injunction is issued, the appeal from the TRO is often rendered moot and dismissed.  (See *O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 210, fn. 4 ["appeal from the TRO, following the trial court's grant of the three-year restraining order, is moot" and dismissed].)

Here, when the court issued the TRO and order to show cause, it scheduled a preliminary injunction hearing to be held in a month.  However, after appellants filed their notice of appeal, the trial court vacated the preliminary injunction hearing date.[6] The preliminary injunction hearing was later placed back on calendar, but it has been repeatedly continued and was last on calendar for April 2023.  The TRO remains in place but is stayed.[7]

---

[6] It appears from the record the trial court believed it lacked jurisdiction to proceed with the preliminary injunction hearing after the notice of appeal was filed.

[7] Appellants argue the TRO here "is more properly described as a preliminary injunction" because it states it shall remain in effect until further order of the court.  (See *McManus v. KPAL Broadcasting Corp.* (1960) 182 Cal.App.2d 558, 562.)  We disagree. This language in the TRO does not compel us to treat the order as a preliminary injunction.  At the hearing on eGumball's TRO application, the trial court made numerous comments reflecting its intent the order be a TRO and a preliminary injunction hearing would follow soon thereafter.

## II.

### APPLICABLE LEGAL PRINCIPLES

"A temporary restraining order is issued to prohibit the acts complained of, pending a hearing on whether the plaintiff is entitled to a preliminary injunction. [Citations.]" (6 Witkin, Cal. Proc. (6th ed. 2021) Provisional Remedies, § 277, p. 208; accord, *Chico Feminist Women's Health Center v. Scully* (1989) 208 Cal.App.3d 230, 237, fn. 1.) A TRO is similar to a preliminary injunction as it is appealable (see discussion *ante*) and enforceable by contempt proceedings (Code Civ. Proc., § 1209, subd. (a)(5)). "But it is distinguishable in the following respects: it may be issued ex parte; a bond, though commonly required, is not essential; and it is of short duration, normally expiring at the time of the hearing on the preliminary injunction." (6 Witkin, Cal. Proc. (6th ed. 2021) Provisional Remedies, § 277, p. 208.)

A trial court's analysis is circumscribed when considering a TRO. "The ex parte hearing concerning a TRO is no more than a review of the conflicting contentions to determine whether there is a sufficiency of evidence to support the issuance of an interlocutory order to keep the subject of litigation in status quo pending a full hearing to determine whether the applicant is entitled to a preliminary injunction. [Citation.] The issuance of a TRO is not a determination of the merits of the controversy. [Citation.] All that is determined is whether the TRO is necessary to maintain the status quo pending the noticed hearing on the application for preliminary injunction. [Citation.]" (*Landmark Holding Group, Inc. v. Superior Court* (1987) 193 Cal.App.3d 525, 528 (*Landmark*).) The moving party has the burden of establishing it is entitled to the requested relief. (*Drakes Bay Oyster Co. v. California Costal Com.* (2016) 4 Cal.App.5th 1165, 1172 (*Drakes*).)

When ruling on a TRO application, the trial court should evaluate "'two interrelated factors'": (1) the likelihood the moving party will prevail on the merits at trial, and (2) the relative interim harm to the parties from issuance or nonissuance of the

17

order.  (*Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244, 1251.)  "'The trial court's determination must be guided by a "mix" of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support [a restraining order]. . . .'" (*Id.* at pp. 1251-1252.)  But "'[a] trial court may not grant a [restraining order], regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim.' [Citation.]" (*Id.* at p. 1252.)

Similarly, appellate review of an order granting a temporary restraining order involves reviewing the trial court's evaluation of the likelihood of success and interim harm factors.  "If the trial court abused its discretion on either factor, the Court of Appeal must reverse.  [Citation.]" (*Church of Christ in Hollywood v. Superior Court, supra*, 99 Cal.App.4th at p. 1252.)  "A trial court will be found to have abused its discretion only when it has '"exceeded the bounds of reason or contravened the uncontradicted evidence."'  [Citations.]  Further, the burden rests with the party challenging the injunction to make a clear showing of an abuse of discretion.  [Citations.]" (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69 [decision to grant preliminary injunction reviewed for abuse of discretion].)

An "appellate court does not resolve conflicts in the evidence, reweigh the evidence, or assess the credibility of witnesses.  [Citation.]" (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450.)  If the evidence before the trial court was in conflict, "'we must interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.' [Citation.]" (*Ibid.*)  "Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence.  [Citation.]  Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.  [Citations.]" (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625.)

18

An injunctive order can be mandatory, prohibitory, or both. An interim mandatory injunctive order is scrutinized ""'"even more closely for abuse of discretion."'"" (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1047-1048.) Thus, we must first determine whether the TRO is mandatory or prohibitory to apply the appropriate standard of review.

III.

MANDATORY AND PROHIBITORY INJUNCTION

Appellants contend the TRO is a mandatory injunction and is therefore subject to heightened scrutiny on appeal. eGumball disagrees and asserts the TRO is prohibitory. We conclude the TRO has both mandatory and prohibitory provisions.

A mandatory injunction compels a party to perform an affirmative act. (*Daly, supra*, 11 Cal.5th at p. 1041.) "Such an injunction, by definition, commands some change in the parties' positions." (*Ibid.*) A prohibitory injunction, on the other hand, requires a party to refrain from a particular act. (*Ryland Mews Homeowners Assn. v. Munoz* (2015) 234 Cal.App.4th 705, 712, fn. 4 (*Ryland*).) "The substance of the injunction, not the form, determines whether it is mandatory or prohibitory. [Citation.]" (*Davenport v. Blue Cross of California* (1997) 52 Cal.App.4th 435, 447.)

Here, the TRO issued by the trial court has two provisions; one is mandatory, and the other is prohibitory. In the TRO's first provision, the court ordered appellants to take affirmative actions to have eGumball removed from the MATCH list. Specifically, appellants were ordered "to request MasterCard to have eGumball, Inc.'s Member Alert to Control High-Risk Merchants List (aka 'Match' list) designation reversed and to request MasterCard remove eGumball, Inc. from the MATCH list." This fits the definition of a mandatory injunction. It compels appellants to perform affirmative acts that will change the status quo from the time the order is entered. (*Daly, supra*, 11 Cal.5th at pp. 1045-1046.)

The second part of the TRO is prohibitory. It restrains and enjoins appellants from placing eGumball back on the MATCH list based on the "events

19

underlying or related to its placement on the MATCH list on June 4, 2021." It is prohibitory because it requires appellants refrain from taking a particular action. (*Ryland, supra*, 234 Cal.App.4th at p. 712, fn. 4.)[8]

eGumball's argument the TRO is only prohibitory is based on a misunderstanding of *Daly, supra*, 11 Cal.5th 1030. In *Daly*, the Supreme Court acknowledged "the distinction between a mandatory and a prohibitory injunction" is sometimes "easier to state than to apply." (*Id.* at p. 1041.) To provide clarity, the high court identified "certain benchmarks that help guide the inquiry." (*Id*. at p. 1042.) The court reviewed case law spanning more than a century that addressed the mandatory-prohibitory injunction distinction in various contexts. (*Id.* at pp. 1042-1044.) In these cases, the *Daly* court explained, the determination of whether the order was mandatory or prohibitory was based on consideration of whether the injunction changed the position of the parties *at the time it was issued*. (*Id.* at p. 1044.) If the injunction changed the relative rights, status, or position of the parties at the time it was entered, the injunction was mandatory. (*Ibid.*)

In *Daly*, the Supreme Court recognized some cases had suggested "a different baseline" for measuring the change in the parties' relative positions. (*Daly, supra*, 11 Cal.5th at p. 1045.) In those cases, the relevant status quo was not the parties' position at the time the injunction was entered "but an earlier '"actual peaceable, uncontested status which preceded the pending controversy."'' [Citation.]" (*Ibid*.)

---

[8] In their appellate briefs, the parties do not parse the TRO into separate parts. Appellants have taken the position the TRO is mandatory and therefore stayed in its entirety pending this appeal. Only the mandatory provision of the TRO is stayed pending appeal. (See *Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.* (2015) 238 Cal.App.4th 259, 265, fn. 4 [when an injunction grants both mandatory and prohibitory relief, an appeal stays the mandatory provisions but not the prohibitory provisions].) Here, the stay of the mandatory provision rendered the prohibitory provision purposeless. Until appellants act to remove eGumball from the MATCH list, they need not be prohibited from placing eGumball back on the MATCH list.

eGumball focuses on this formulation in its argument the TRO is prohibitory.  The Supreme Court, however, made clear this baseline was limited to "an injunction preventing the defendant from committing additional violations of the law," as it orders the defendant not to repeat its past violations.  (*Id.* at p. 1046.)  Thus, the "last actual peaceable, uncontested status" formulation applies only where the injunctive order aims to prevent injury from future conduct.  (*Ibid.*)  It does not apply where the injunction calls for the performance of an affirmative act to remedy a past violation.  (*Ibid.*)

Here, the first portion of the TRO requires appellants to perform an affirmative act to remedy what eGumball alleges is a past violation—placing eGumball on the MATCH list.  Therefore, the "last actual peaceable, uncontested status" baseline does not apply. (*Daly, supra*, 11 Cal.5th at p. 1046.)  Following *Daly*'s guidance, we conclude the TRO's first provision is a mandatory injunction.  (See *id.* at p. 1047 [order board rescind appointment of member so replacement could be seated was mandatory]; *Shoemaker v. County of Los Angeles, supra*, 37 Cal.App.4th at p. 625, fn. 4 [injunction requiring defendants take action to restore plaintiff to his positions was "undoubtedly mandatory" because he had already been removed when court issued order].)

"When, as here, the preliminary injunction mandates an affirmative act that changes the status quo, it is scrutinized even more closely on appeal:  ""'"The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts.  A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal."'  [Citation.]  The granting of a mandatory injunction pending trial '"is not permitted except in extreme cases where the right thereto is clearly established."'  [Citation.]"  [Citation.]'  [Citation.]"  (*City of Corona v. AMG Outdoor Advertising, Inc.* (2016) 244 Cal.App.4th 291, 299.)  But even if courts are more reluctant to interpose a mandatory injunction, it is not to be denied in the proper case.  (*Ryland, supra*, 234 Cal.App.4th at p. 712, fn. 4.)

21

IV.

THE TRIAL COURT ABUSED ITS DISCRETION

It bears repeating, the purpose of a TRO is to preserve or change the status quo pending a hearing on the application for a preliminary injunction. (*Landmark, supra*, 193 Cal.App.3d at p. 528.) As the moving party, eGumball had the burden of showing it was likely to prevail on the merits of its claims and it would suffer great or irreparable harm if the court did not grant the TRO. (See *Drakes, supra*, 4 Cal.App.5th at pp. 1171-1172.) If eGumball failed to establish one of these factors, then we must reverse the court's granting of the TRO. (*Church of Christ in Hollywood v. Superior Court, supra*, 99 Cal.App.4th at p. 1252.) We focus only on whether eGumball made a showing sufficient to support the issuance of the TRO. To be specific, we focus on whether the evidence was sufficient to support the trial court's implied finding of interim harm pending the preliminary injunction hearing. We conclude the evidence was insufficient and the court abused its discretion by issuing the TRO. Our opinion should not be read as addressing whether eGumball is entitled to a preliminary injunction, a hearing on which is pending in the trial court. Our opinion is limited to the evidence before the trial court at the time it issued the TRO.

At the time of the TRO hearing, the issue before the trial court was whether eGumball had provided evidence demonstrating great or irreparable injury if a TRO was not issued pending a hearing on the preliminary injunction. (*Landmark, supra*, 193 Cal.App.3d at p. 528; Cf. *White v. Davis* (2003) 30 Cal.4th 528, 554 ["To obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits"].) Stated more succinctly, eGumball needed to show interim harm without a TRO in place. This they did not do. eGumball made a showing the MATCH listing had damaged its business and this injury had been ongoing since the beginning of June 2021. But eGumball did not show it would be out of business or

22

would lose significantly more business before a preliminary injunction hearing could be held. eGumball simply did not demonstrate a need for the court to take immediate action pending a hearing on the preliminary injunction. This was not a situation where a building was about to be demolished and a TRO was needed to enjoin the demolition pending a hearing on a preliminary injunction. (See *Ciani v. San Diego Trust & Savings Bank* (1991) 233 Cal.App.3d 1604, 1610.)

Nor was this a situation where the TRO requested would provide immediate relief. The relief eGumball sought was to have appellants remove its name from the MATCH list. Even if this was not a mandatory injunction stayed on appeal, this relief would not have permitted eGumball to immediately begin processing credit cards and repair its revenue stream. Once eGumball is taken off the MATCH list, it still has to obtain the services of an acquirer to process the credit card payments eGumball receives. The record demonstrates this process takes weeks. In 2014, when eGumball applied for a merchant account with Merrick, the process took three weeks from the time eGumball submitted its merchant application until it was approved. When Merrick terminated eGumball's account, eGumball's owner, Bauer, recognized the company would need time to find a new acquirer. In an e-mail to Paysafe, Bauer requested 60 days of payment processing, stating "It's not like a merchant account can be set up with a flick of a switch." Thus, it was unlikely eGumball would have been able to process any credit card payments prior to the preliminary injunction hearing, even if the TRO had not been stayed pending this appeal.[9]

---

[9] In granting the TRO, the court stated it might not grant a preliminary injunction after hearing additional evidence and arguments, and if it did not, appellants could put eGumball back on the MATCH list. This and other comments by the court suggest the court was not convinced at that time eGumball was entitled to a preliminary injunction. With the possibility of being placed back on the MATCH list looming, it is unlikely eGumball would have been able to obtain a merchant account with a new acquirer prior to the anticipated preliminary injunction hearing.

In the trial court, appellants argued the TRO should be denied because eGumball had not established exigent circumstances warranting immediate relief. They noted eGumball was placed on the MATCH list more than 16 weeks before it sought the TRO and eGumball had provided no evidence explaining why "emergency" injunctive relief was necessary. Although given an opportunity, eGumball did not provide evidence of great or irreparable injury pending a preliminary injunction hearing.

We conclude eGumball did not show it would suffer great or irreparable injury before a hearing on the preliminary injunction could be held. Accordingly, the trial court abused its discretion by issuing the TRO.

We are sympathetic to the difficult analysis before the trial court in considering eGumball's application for a TRO. The trial court was presented with eGumball's allegations appellants' actions of trade libel and defamation were destroying its business and removal from the MATCH list was the only thing that could save eGumball. Appellants responded with several arguments. In addition to arguing eGumball had not shown an urgent need for relief, appellants argued eGumball was not entitled to injunctive relief because it was unlikely to succeed on the merits and had not established irreparable harm. But they also asserted that under the terms of Merrick's Merchant Agreement, eGumball could not bring claims against Merrick for Merrick's MATCH reporting and had to bring any claims against Merrick in Utah. Appellants further asserted the TRO should be denied because it would restrain their speech by requiring them to retract eGumball's MATCH listing. They argued eGumball could not succeed on the merits of its claims because appellants' "allegedly defamatory statements are protected by a common interest privilege" under Civil Code section 47 and eGumball could not prove malice. eGumball responded to the contract argument by asserting the terms were not enforceable against it, but eGumball did not respond to the arguments concerning the common interest privilege or invoking the First Amendment to the United

24

States Constitution.  Appellants also filed numerous evidentiary objections to the declaratory evidence eGumball submitted in support of its TRO application.

The record does not show the trial court analyzed the contract or common interest privilege arguments or the First Amendment concerns.  Nor did the court rule on the evidentiary objections.  The record indicates the court was inclined to address these issues at the preliminary injunction hearing.  We express no opinion on these issues.  Our decision is limited to our conclusion the trial court abused its discretion by issuing the mandatory TRO prior to conducting a hearing on the preliminary injunction.  We emphasize—we conclude only that the trial court abused its discretion by issuing a TRO based on the evidence before it.

We encourage the trial court and the parties to give priority to the pending preliminary injunction hearing as the matter was originally scheduled to be heard in November 2021 and has been repeatedly continued since.  If the trial court issues a preliminary injunction, it must be carefully crafted based on the evidence before it concerning the different roles and responsibilities of Merrick, Paysafe, and Visa.  The record before this court reflects only Merrick has the ability to request eGumball be placed on or removed from the MATCH list.

## DISPOSITION

The temporary restraining order is reversed.  Each party shall bear its own costs on appeal.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.